**STATE of Iowa, Appellee,**

v.

**Owens Arnez THOMPSON, Appellant.**

**No. 96–1296.**

Supreme Court of Iowa.

Nov. 26, 1997.

Linda Del Gallo, State Appellate Defender, and John P. Messina, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Ann E. Brenden, Assistant Attorney General, John Sarcone, County Attorney, and Melodee Hanes and Odell McGhee, Assistant County Attorneys, for appellee.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

NEUMAN, Justice.

Two-year-old Devon Simmons died after his mother's roommate, defendant Owens Thompson, slammed him into the corner of a bed's wooden box spring, lacerating his liver. The principal question on Thompson's appeal from his conviction of first-degree murder is whether he was entitled to a more exacting jury instruction defining the phrase "extreme indifference to human life" as an element of the crime. Thompson also challenges the propriety of the court's instruction on malice aforethought. Finding no error warranting reversal, we affirm.

A jury could have found the following facts. Around supper time on December 15, 1995, Heather Simmons left her son, Devon, with Owens Thompson while she and Thompson's brother, Pat, went out to get pizza. Devon was in good spirits when they left, eager at the prospect of eating pizza for supper. When Heather and Pat returned thirty minutes later, however, Devon was not himself. He appeared to be sick to his stomach. He wanted juice, not pizza, and asked to lie down away from the others. He soon vomited. Heather bathed him and then made a quick trip to the store for 7–Up, thinking this would settle his stomach. Upon her return she became alarmed about the child's lethargy and his difficulty breathing. She had trouble keeping him awake.

At this point Heather wanted to call 911 for emergency assistance but Owens refused to let her. He feared medical personnel would suspect child abuse from the multiple bruises on Devon's little chest. The bruises were the result of Owen's recent persistent poking as a means of disciplining Devon for failed toilet training. No call for emergency assistance was made.

Around 9 p.m., Pat returned and—recognizing the child's critical status—insisted they take him to the hospital. There, despite

the heroic efforts of emergency room physicians and nurses, Devon died around 11 p.m. Except for bruising all over his body, particularly remarkable in the chest area, no reason for Devon's death was immediately apparent.

An autopsy revealed a lacerated liver that caused Devon to die from internal bleeding. The laceration was described as "significant," appearing to be the product of severe blunt trauma. Doctors testified that the force needed to deliver such a blow would be equivalent to that experienced by a victim in a car crash.

Preliminary police investigation revealed that Thompson was alone with Devon during the brief period when his condition changed from normal to gravely ill. Thompson first denied any insight into the cause of Devon's distress, then said that while playing with Devon in the bedroom he had spun him around and accidentally hit the bed. After consulting with his mother, Thompson revealed a more sinister explanation: in a fit of anger over Devon yet again soiling his pants, Thompson grabbed Devon by the arms and, after twirling him in the air, slammed him against the corner of the bed. Thompson insisted he meant only to frighten the child but accidentally struck him on the wooden part of the bed frame.

The State charged Thompson with first-degree murder under two alternative theories: willfully, deliberately, and with premeditation in violation of Iowa Code sections 701.1 and 707.2(1) (1995), or while committing child endangerment or assault on a child under circumstances manifesting extreme indifference to human life in violation of Iowa Code section 707.2(5). At the close of all the evidence, the State moved to amend the trial information to conform to proof offered at trial that, instead of premeditated murder, Thompson was guilty of felony murder (the felony being child endangerment) in violation of Iowa Code section 707.2(2). *See* Iowa Code § 726.6(2) (defining felony child endangerment). The court granted the motion over defendant's objection. Instructions on lesser-included offenses of second-degree murder and involuntary manslaughter were also submitted.

The jury returned a verdict finding Thompson guilty of first-degree murder. In keeping with Uniform Criminal Jury Instruction 100.16 and *State v. Bratthauer*, 354 N.W.2d 774, 777 (Iowa 1984), the jury's verdict did not identify upon which alternate theory or combination thereof its decision rested. This appeal by Thompson followed.

Thompson claims that "extreme indifference to human life," an essential element of the child homicide alternative, was improperly defined by the court and failed to convey the high degree of culpability required of a first-degree murder conviction. Thompson also challenges the way the court defined malice aforethought. He claims the instruction given was discredited in *State v. Lee*, 494 N.W.2d 706, 707 (Iowa 1993), entitling him to a new trial.

■ When jury instructions are challenged on appeal, we review them to determine whether they correctly state the law and are supported by substantial evidence. *State v. Predka*, 555 N.W.2d 202, 204 (Iowa 1996). Evidence is substantial if it would convince a reasonable person of the fact sought to be proven. *Id.*

## I. *Extreme Indifference to Human Life.*

■ Iowa Code section 707.2(5) provides that a person commits murder in the first degree when:

> The person kills a child while committing child endangerment under section 726.6, subsection 1, paragraph "*b*", or while committing assault under section 708.1 upon the child, and the death occurs under circumstances manifesting an extreme indifference to human life.

The phrase "manifesting an extreme indifference to human life" is new to our criminal law and appears exclusively in section 707.2(5). Our legislature passed this child homicide statute in 1994 as part of a comprehensive act targeting juvenile justice and the protection of children. *See* 1994 Iowa Acts ch. 1172, § 42. The import of the phrase "extreme indifference to human life" poses a question of first impression for our court but it has been the subject of wide discussion in other jurisdictions.

The district court defined the phrase in the following instruction:

> With regard to element number five of instruction number twenty-two, "manifest" means easily understood or obvious to the mind.
>
> "Indifference" means to be aloof, callous and uncaring.

Thompson argued at trial, and contends on appeal, that the court's definition erroneously failed to embrace concepts of "knowing risk" and "recklessness traditionally associated with extreme indifference homicide." The State counters, first, that the phrase "manifesting an extreme indifference to human life" is easily understood and requires no further explanation. Second, the State asserts Thompson's focus on recklessness does not correctly reflect the gradation of culpability expressed in our homicide law.

It appears from the court's colloquy with counsel that both agreed "indifference" was properly defined in terms of *callousness*. The dispute centers on whether "extreme"— used to modify "indifference" in the statute— required further explication to help the jury, in defendant's words, "sufficiently distinguish the second-degree murder of a child from the first-degree murder of a child."

■ Our analysis starts with the premise that words used in a jury instruction need not be defined "if they are of ordinary usage and are generally understood." *State v. Weiss,* 528 N.W.2d 519, 520 (Iowa 1995). A word's meaning can be determined by its use in context. *Id.* Other courts addressing the precise question before us have found no need to elaborate on the definition of "extreme indifference to the value of human life." In *State v. Dominguez,* 128 N.H. 288, 512 A.2d 1112, 1113 (1986), for example, the New Hampshire Supreme Court said simply:

> Although a trial judge has a comprehensive obligation to instruct a jury on the law, the judge has no duty to explain non-technical terms or phrases that are readily comprehended. "Extreme indifference to the value of human life" is such a phrase.

(Citations omitted.) The court's observation cited model penal code commentary quoted here in a more recent case from the Kansas Supreme Court:

> [W]hen the jury is determining whether a reckless killing indicates an extreme indifference to the value of human life beyond that indifference present in all reckless killings, the question is whether the jury can determine what "extreme indifference to the value of human life" is or whether this phrase is so vague that a jury needs an instruction to explain it. The comments to the Model Penal Code depraved heart statute, which the Kansas depraved heart statute is patterned after, state:
>
> > "Given the Model Code definition of recklessness, the point involved is put adequately and succinctly by asking whether the recklessness rises to the level of 'extreme indifference to the value of human life.' As has been observed, it *seems undesirable to suggest a more specific formulation.* [Other] variations ... retain in some instances greater fidelity to the common-law phrasing but they do so at great cost in clarity....' " A.L.I., Model Penal Code & Commentaries, Part II § 210.2, comment 4, pp. 25–26 (1980).

*State v. Robinson,* 261 Kan. 865, 934 P.2d 38, 48 (1997) (emphasis added). The Kansas court went on to observe that juries are regularly asked to decipher many difficult phrases without specific definition and the phrase at issue was not so vague as to offend constitutional norms. *Id.; see also State v. Dow,* 126 N.H. 205, 489 A.2d 650, 652 (1985) (phrase is "easily understood"). In another recent case regarding gradations of culpability in a prosecution for murder, the North Dakota Supreme Court described "extreme indifference to the value of human life" as a phrase of understandable and distinct meaning correctly used to distinguish a greater crime from a lesser crime. *State v. Tweed,* 491 N.W.2d 412, 419 (N.D.1992).

■ We agree that the phrase "manifesting an extreme indifference to human life," when considered in the context of a killing of a child with malice, sufficiently describes the aggravating circumstance elevating the act from second-degree to first-degree murder so as to need no further or other explanation. Our view is fortified when we consider it in the light of Thomp-

son's claim that the court's definition erroneously failed to incorporate concepts of "knowing risk and recklessness." We are convinced the legislature intended something more than recklessness—even "heightened" recklessness—when it enacted section 707.2(5). Unlike the Kansas "depraved heart" statute discussed above in the *Robinson* case, our statute is not defined in terms of recklessness; the crime's foundation is murder, defined as a killing with malice. Iowa Code § 707.1; *cf. State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993) (recklessness defines standard of conduct in manslaughter cases). Our law makes clear the distinction between malice and recklessness. Malice is defined as a state of mind leading one to *intentionally* commit a wrongful act. *State v. Klindt*, 389 N.W.2d 670, 676 (Iowa 1986); 1 Iowa Crim. Jury Instr. 200.19. Recklessness, on the other hand, embraces the concept of conduct "consciously done with willful disregard of the consequences" but "is not intentional in the sense that harm is intended to result." 1 Iowa Crim. Jury Instr. 200.20; *State v. Conyers*, 506 N.W.2d 442, 444 (Iowa 1993); *State v. McLaughlin*, 250 Iowa 435, 440, 94 N.W.2d 303, 306 (1959).

As rightly asserted by the State, by enacting section 707.2(5), the legislature has not merely elevated recklessness-based manslaughter to recklessness-based murder. Premised on murder, not recklessness, the statute identifies additional elements distinguishing it from second-degree murder: (1) a child victim, (2) the killing occurs during an assault, and (3) the death occurs under circumstances manifesting an extreme indifference to human life. Iowa Code § 707.2(5). The crime fits logically into the continuum of homicide offenses which reveals "a gradation of culpability commensurate with the gradation of punishment." *State v. Conner*, 292 N.W.2d 682, 684 (Iowa 1980). The "extreme indifference" element stands apart from, and in addition to, the element of malice. No further elaboration—by reference to risk of danger or recklessness—adds in a meaningful way to the words themselves.

We conclude that the sparse definition furnished by the district court here was at worst unnecessary. The court's refusal to submit the recklessness-based instruction submitted by Thompson clearly furnishes no ground for reversal.

## II. *Malice Aforethought.*

■ An essential element of both first-degree murder alternatives charged under section 707.2 is malice aforethought. Following the language of the uniform instruction, the court correctly defined the term as a state of mind which leads to an intentionally wrongful act done out of hatred or with an evil or unlawful purpose. *See* 1 Iowa Crim. Jury Instr. 700.7. The court went on to define the concept of "aforethought" consistent with the instruction, *see id.*, but added the following sentence: "It is sufficient if [the malice] exists any time before the killing." This latter sentence was criticized in *State v. Lee*, 494 N.W.2d at 707. There we observed that

> [t]he relationship that must be shown between the state of mind that is malice aforethought and the homicidal act is more accurately characterized as a causal relationship than a temporal relationship.

*Lee*, 494 N.W.2d at 707. Believing the rest of the definition accurately conveyed this concept without the potentially misleading use of the phrase "any time," we suggested courts strike the final sentence of former Iowa Uniform Criminal Jury Instruction 700.7. *Id.* at 708.[1] Over defendant's timely objection, the court failed to do so here.

The question is whether the court's reliance on an outdated instruction warrants reversal. We think not. As in *Lee*, when the malice instruction is read in conjunction with the marshaling instruction any ambiguity is dissipated. *Id.* at 707. In *Lee*, the defendant's claim of self-defense necessarily focused the jury on the defendant's state of mind at the time of the shooting. *Id.* at 708. So also here, the marshaling instruction tied the malice aforethought with the act of assault. Evidence tending to show Thompson's actual hatred or fixed intent to do injury focused not on events occurring "any time."

1. Iowa Criminal Jury Instruction 700.7, as revised, conforms to our decision in *Lee*. To the extent *State v. Taylor*, 516 N.W.2d 38, 41 (Iowa App. 1994), adheres to the former definition, *Lee* controls.

The evidence focused on acts—including twenty-to-thirty fresh bruises on Devon's chest, Thompson's unwillingness to call 911, and his silence in the face of the true nature of the medical emergency—all of which were contemporaneous with the brutal act from which the child died. The court's errant addition to the instruction, under these facts, provides no ground for reversal.

**AFFIRMED.**