# IN THE COURT OF APPEALS OF IOWA

No. 3-1202 / 12-2272
Filed March 12, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**RYAN N. TROWBRIDGE,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Ryan Trowbridge appeals from the judgment and sentence following his convictions of first-degree murder and child endangerment resulting in death. **AFFIRMED.**

S.P. DeVolder of The DeVolder Law Firm, Norwalk, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan M. Horvat and Steven Foritano, Assistant County Attorneys, for appellee.

Heard by Potterfield, P.J., and Doyle and Bower, JJ.

**DOYLE, J.**

Ryan Trowbridge appeals from the judgment and sentence following his convictions of first-degree murder and child endangerment resulting in death. Trowbridge challenges the sufficiency of the evidence to support his convictions and the admission of certain rebuttal evidence presented by the State. He also claims his murder conviction is precluded under *Heemstra* principles. We affirm.

**I.      *Background Facts and Proceedings***

On February 28, 2010, A.F. gave birth to R.T. The child's father was Ryan Trowbridge. In July 2010, R.T. was a healthy four-month-old infant described as "happy" and "perfect," who was developing normally for her age.

A.F. and R.T. lived with Trowbridge in Ankeny. Trowbridge cared for the child while A.F. worked in the morning through early afternoon. A.F. then cared for R.T. in the afternoon and evening while Trowbridge worked. A.F. and Trowbridge also received help from the child's grandparents and other family members who lived nearby.

On the morning of July 12, 2010, Trowbridge called A.F. at work and told her there was an emergency with the child. That week, A.F., R.T., and Trowbridge were house-sitting A.F.'s parents' house a few blocks from their apartment but their "daily routine was still the same." A.F. worked several blocks away and got to the house within minutes.

Trowbridge told A.F. that R.T.'s head had become stuck facedown in between the mattress and the headboard. A.F. saw R.T.'s condition and became frantic as Trowbridge called 911. The 911 operator dispatched EMTs and instructed Trowbridge on CPR. When the EMTs arrived, they found R.T. in acute

distress and not breathing. The child was transported to Blank Children's Hospital, where doctors found no brain activity. R.T. died the next day at the hospital.

An autopsy revealed the child had a fresh subdural hemorrhage, a traumatic axonal injury in the lower part of the brain near the spinal cord, bleeding within the spine, and bleeding around the eyes to the brain internally.[1] The child had detached retinas in both eyes and extensive retinal hemorrhaging in both eyes. Physicians and medical examiners opined the injuries to R.T.'s neck and head were consistent with a trauma such as an acceleration and deceleration injury. The chief Polk County medical examiner stated the child's eyes were some of the worst eyes he had examined in his entire career, and there was no question in his opinion R.T. suffered an abusive trauma. The examiners further opined the child's head injury occurred immediately before she became symptomatic and resulted in her death. They ruled out asphyxiation as a possible cause of the deep brain injuries and eye injuries suffered by the child. The autopsy set forth the cause of death as "Abusive head trauma."

Trowbridge was charged with first-degree murder and child endangerment resulting in death. He waived trial by jury. Following a trial to the court, at which extensive medical evidence was presented by both sides, the district court made detailed findings of fact and conclusions of law. The district court noted:

> Prior to July 12, 2010, [R.T.] was a healthy child of four months. She quickly and suddenly went from being a healthy baby on July 12, 2010, to being one in extreme distress, so critical, that on the next day, July 13, 2010, she died. The speed of her descent

---

[1] The child had also sustained, at one time, a broken clavicle, at least one rib fracture, and either a skull fracture or an extra suture in her head bones.

from a healthy child to death clearly and convincingly suggests that an intervening force or cause led to her demise. The medical evidence presented by the State of Iowa and by the Defendant was informative and essential in ascertaining the truth behind how [R.T.] died. The medical evidence presented by the State, as well as the facts and circumstances surrounding the morning of July 12, 2010, clearly indicates and demonstrates beyond a reasonable doubt that the Defendant was the instrument of [R.T.]'s death. The evidence shows that there was a trauma inflicted on [R.T.] of sufficient force to her head to cause her brain to swell, hypoxic ischemia, acute subdural bleeding, retinal bleeding, retinal detachment, axonal injury, and bleeding on her spine. Taken together these injuries could only have happened by force applied by her caregiver, the Defendant, in the short amount of time that he was in charge of her care on July 12, 2010. The Defendant's description of what occurred that morning is unconvincing as to the methodology of [R.T.]'s injuries and subsequent death. Equally so, the medical experts of the Defendant were not convincing or at times even sure just how [R.T.] came to die in the manner that she did. "Wedging" was discussed as a possible cause of her injuries and a loss of oxygen to her brain as well as the method of CPR performed on her and the fact that she was on a ventilator or resuscitator for a lengthy amount of time, but the facts show that [R.T.] could not have been wedged as described by the Defendant.

The district court ultimately concluded:

The conclusions to be reached from all of the evidence in this case is that the Defendant, the sole care provider at the time of the sudden and severe and critical distress that [R.T.] faced on July 12, 2010, was the source of [R.T.]'s injuries and her death. The Defendant, as shown by the facts and circumstances and the medical evidence, acted intentionally, willfully and deliberately; committed the act of child endangerment upon [R.T.]; assaulted [R.T.] by grabbing [R.T.] and shaking her body and/or slamming her in such a manner that a serious and critical head trauma was inflicted upon her under circumstances manifesting an extreme indifference to human life and, specifically, the life of [R.T.].

The injuries that [R.T.] suffered on July 12, 2010, were directly the result of the actions of the Defendant and were of such a traumatic and violent nature that wedging and/or suffocation could not have been the cause of such extensive injuries. Dr. Schmunk testified that the eye injuries were some of the worst he had examined in his entire career. The extensive hemorrhaging in all layers of the retina and the detached retinas are entirely consistent with a trauma to the head of the child.

The conclusion to be drawn from this tragedy is that [R.T.], a child of approximately 4 months of age, was a healthy, happy, normal child, loved by many, who on July 12, 2012, was suddenly, intentionally, willfully, deliberately, knowingly, and with premeditation and malice aforethought assaulted and physically abused so severely by the Defendant that her death occurred under circumstances manifesting an extreme indifference to human life. The Defendant committed child endangerment resulting in the death of [R.T.] while having custody and control over her on July 12, 2010.

Trowbridge filed a motion for new trial, which the court denied. Trowbridge appeals.

## II.    *Sufficiency of the Evidence*

Trowbridge contends there was insufficient evidence to prove he caused the child's death.[2]  To find Trowbridge guilty of first-degree murder, the State had to prove on or about July 12-13, 2010, Trowbridge shook, struck, and/or assaulted the child; the child was under age fourteen; the child died as a result of being shaken, struck, or assaulted by Trowbridge; Trowbridge acted with malice aforethought; Trowbridge was committing the offense of child endangerment or assault; and the child's death occurred under circumstances showing an extreme indifference to human life.  *See* Iowa Code §§ 707.1, 707.2(5) (2009).  To find Trowbridge guilty of child endangerment resulting in death, the State had to prove Trowbridge was the parent of the child; the child was under age fourteen; Trowbridge knowingly acted in a manner creating a substantial risk to the child's physical health or safety, or by an intentional act or series of intentional acts used unreasonable force, torture, or cruelty that resulted in bodily injury or that was intended to cause serious injury; and Trowbridge's acts resulted in the child's

---

[2] Although Trowbridge raises this claim in Division III of his brief, we elect to address it first to clarify our analysis of his remaining claims on appeal.

death.  *See* Iowa Code §§ 708.1, 726.6(1)(b).  The offenses require proof Trowbridge committed the act resulting in injury to the child, and the child died as a result.[3]  Trowbridge contends the evidence does not prove beyond a reasonable doubt he inflicted the injury causing the child's death.  He claims the State's evidence required the court to "guess" what caused the child's death.

We review challenges to the sufficiency of the evidence for correction of errors at law.  *See State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).  We "consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence."  *Id.* (internal quotation marks omitted).  "We will uphold a verdict if it is supported by substantial evidence."  *State v. Jacobs*, 607 N.W.2d 679, 682 (Iowa 2000).  It is the State's "burden to prove every fact necessary to constitute the crime with which the defendant is charged, and the evidence presented must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture."  *State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011).

In its written opinion, the district court carefully detailed the evidence, and we find it unnecessary to reiterate those extensive findings here.  Trowbridge reiterates the defense experts opined the child's death was caused by an undetermined event, "but one consistent with a suffocation tragedy," whereas the State's experts opined the child's death was caused by inflicted head trauma. Trowbridge acknowledges the court "gave credence" to the State's experts over the defense's experts regarding the cause of R.T.'s death, as the court is entitled

---

[3] Although Trowbridge does not specifically take issue with child endangerment conviction, his claim encapsulates both convictions; he contends the State failed to prove he committed the act of child endangerment or assault.

to do in a battle-of-the-experts case. *See State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) ("The trial court as trier of fact is not obligated to accept opinion evidence, even from experts, as conclusive. When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses."). Trowbridge claims, however, this was not a "classic" battle-of-the-experts case because although the State's experts unanimously opined the child's death was result of inflicted head trauma, their testimony conflicted "on how each expert reached [that] conclusion." For that reason, Trowbridge believes the court erred in relying on the State's experts over his.

Trowbridge's argument misses a critical point—namely, as he points out, the State's experts *consistently* testified R.T.'s death was caused by an abusive or inflicted head trauma.[4] Indeed, there is substantial record evidence supporting the district court's findings the child's death was the result of a non-accidental traumatic injury occurring immediately before she became symptomatic and her admission to the hospital. And more specifically, there is substantial record evidence supporting the district court's findings the traumatic injury to the child involved shaking violently enough to cause injury within the child's brain, spine, and eyes, and Trowbridge was the only person with the child at that time. We defer to the district court's judgment that Trowbridge's explanation of the cause of the child's injuries was contradicted by the more convincing medical evidence.

---

[4] Trowbridge challenges the district court's allowance of certain rebuttal evidence presented by the State. We address that contention below, but note our analysis of his sufficiency-of-the-evidence claim is not affected the rebuttal evidence he challenges.

The evidence was sufficient to prove Trowbridge was the person who caused the child's injuries that resulted in her death.

### III.    *Weight of the Evidence*

Trowbridge claims "[t]he greater weight of the evidence does not support the district court's finding of the criminal offense element of causation" and he should be awarded a new trial.[5]  *See* Iowa R. Crim. P. 2.24(2)(b)(6) ("The court may grant a new trial . . . [w]hen the verdict is contrary to law or evidence.").  We review the district court's denial of Trowbridge's motion for new trial for abuse of discretion.  *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998).

Trowbridge contends the testimony of the State's experts providing the court a factual basis to conclude the child's death was the result of inflicted head trauma "was hardly rock-solid."  He points out the defense called "well-credentialed" experts to testify the child's injuries were consistent with a suffocation event.

This claim is essentially a request to have us reweigh the evidence and judge the credibility of the witnesses.  This is not our role.  *See State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003).  We are to determine whether the district court abused its discretion in denying the new trial motion.  *See id.* ("On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence.").  We discern no abuse of discretion.  As

---

[5] The State claims this issue is not preserved.  In his motion for new trial, Trowbridge alleged the court's verdict "is contrary to the evidence," citing rule 2.24(2)(b)(6).  The court denied Trowbridge's motion, reiterating its findings that the greater amount of credible evidence supported the State's case than Trowbridge's.  The issue was preserved.

mentioned above, although the testimony of the State's witnesses was not entirely consistent when it came down to the finest details of the medical evidence, the experts all agreed the child's death was caused by an abusive or inflicted head trauma, and it is undisputed Trowbridge was the only person with the child when her injuries occurred. In sum, the district court could have concluded from certain essential facts the evidence did not preponderate heavily against the verdict. *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) (setting forth the weight-of-the-evidence test).

## IV. *Applicability of Heemstra*

Trowbridge claims his conviction of first-degree murder—in light of his conviction of child endangerment resulting in death—is precluded by *State v. Heemstra*, 721 N.W.2d 549, 554, 559 (Iowa 2006) (precluding use of another felony based on the same act as the predicate offense for felony murder). The district court determined *Heemstra* did not apply in this case. We agree.

This claim has been raised before, and rejected by, this court on several occasions. *See, e.g., State v. Porter*, No. 12–0170, 2013 WL 2146543, at *4-5 (Iowa Ct. App. May 15, 2013); *State v. Blanchard*, No. 09-0871, 2010 WL 2089222, at *5-6 (Iowa Ct. App. May 26, 2010). As we stated in those cases, the concerns about felony murder discussed in *Heemstra* are not presented in section 707.2(5) (setting forth the offense of child endangerment). In *State v. Thompson*, 570 N.W.2d 765, 767 (Iowa 1997), the court noted, "Our legislature passed this child homicide statute in 1994 as part of a comprehensive act targeting juvenile justice and the protection of children."

> [B]y enacting section 707.2(5), the legislature has not merely elevated recklessness-based manslaughter to recklessness-based murder. Premised on murder, not recklessness, the statute identifies additional elements distinguishing it from second-degree murder: (1) a child victim, (2) the killing occurs during an assault, and (3) the death occurs under circumstances manifesting an extreme indifference to human life. *The crime fits logically into the continuum of homicide offenses which reveals "a gradation of culpability commensurate with the gradation of punishment."* The "extreme indifference" element stands apart from, and in addition to, the element of malice.

*Thompson*, 570 N.W.2d at 769 (emphasis added). Here, Trowbridge's *Heemstra* claim is inapposite because, as observed in *Thompson*, section 707.2(5) requires not only a showing the child was killed during an assault, but also with malice (the definition of murder under section 707.1) and "under circumstances manifesting an extreme indifference to human life." *See id.*

In this case, we are not faced with an elimination of "all distinctions between first-degree and second-degree murder." *Heemstra*, 721 N.W.2d at 557. Rather, "[t]he extreme indifference element stands apart from, and in addition to, the element of malice." *Thompson*, 540 N.W.2d at 769. In sum, the district court correctly concluded *Heemstra* does not preclude Trowbridge's conviction of first-degree murder.

## V.    *Rebuttal Evidence*

Trowbridge claims the district court abused its discretion in allowing, over his attorney's objections,[6] the rebuttal testimony of Drs. Schmunk and Jenny concerning their conclusions that R.T. died from abusive head trauma, which he

---

[6] As the State points out, Trowbridge did not object to each line of questioning of these witnesses. We elect to bypass the State's partial error preservation concern and proceed to the merits of Trowbridge's claim. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing error preservation problem and proceeding to the merits of the appeal).

alleges was submitted to merely "corroborate, reiterate and repeat the State's theory of the case."

"Rebuttal evidence is evidence that explains, repels, controverts, or disproves evidence produced by the opposing party." *State v. Weaver*, 608 N.W.2d 797, 806 (Iowa 2000). "The trial court has considerable discretion in admitting rebuttal evidence, including the discretion to admit evidence that technically could have been offered as part of plaintiff's case-in-chief. The trial court's ruling will be disturbed only upon a clear abuse of discretion." *Carolan v. Hill*, 553 N.W.2d 882, 889 (Iowa 1996).

Trowbridge essentially alleges the rebuttal evidence was cumulative to the State's case-in-chief and therefore was "improper" and should have been excluded. However, "[t]he fact that testimony might have been useful and usable in the case-in-chief does not necessarily preclude its use in rebuttal," *see id.*, and "[i]t is permissible to rebut testimony of an expert by other experts." *See State v. Willey*, 171 N.W.2d 301, 303 (Iowa 1969). As the district court observed in its ruling on Trowbridge's motion for new trial, the rebuttal testimony of Dr. Jenny was offered to explain, controvert, or disprove the testimony of the defense experts. The same can be said of Dr. Schmunk's testimony. The district court was well within its discretion to allow such rebuttal evidence. *See, e.g.*, *Willey*, 171 N.W.2d at 303 ("Mr. Barton's testimony, when recalled as a witness for the state, was offered to explain, controvert or disprove that previously given by Mr. Moore. This was clearly rebuttal evidence."); *State v. Nelson*, 153 N.W.2d 711, 714 (Iowa 1967) ("[T]he fact testimony used in rebuttal might have been used as

part of the state's main case does not render it inadmissible in rebuttal if it rebuts some of the matters testified to by defendant's witnesses.").

Furthermore, it is significant to note that this was a bench trial, which served to reduce any potential unfair prejudice attendant to the rebuttal evidence. This is generally true because legal training assists the fact finder in a bench trial "to remain unaffected by matters that should not influence the determination." *State v. Matheson*, 684 N.W.2d 243, 244 (Iowa 2004) (noting courts are less likely to reverse when inadmissible evidence is introduced in a bench trial than in a jury trial); *see also State v. Casady*, 491 N.W.2d 782, 786 (Iowa 1992).

## VI. Conclusion

Substantial evidence supports Trowbridge convictions of first-degree murder and child endangerment resulting in death. The district court did not err in concluding *Heemstra* does not apply in this case, and the court exercised its discretion in allowing the State's rebuttal evidence. We affirm.

**AFFIRMED.**