# IN THE COURT OF APPEALS OF IOWA

No. 18-2216
Filed November 4, 2020


**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ZACHARY PAUL KOEHN,**
        Defendant-Appellant.

_____


        Appeal from the Iowa District Court for Chickasaw County, Richard D. Stochl, Judge.


        The defendant challenges his convictions of murder in the first degree and child endangerment resulting in death.  **AFFIRMED.**


        John W. Hofmeyer III, Oelwein, for appellant.

        Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.


        Considered by Bower, C.J., May, J., and Potterfield, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**POTTERFIELD, Senior Judge.**

Zachary Koehn was convicted of murder in the first degree and child endangerment resulting in death. Both convictions involve his approximately four-month-old son, S.K. On appeal, Koehn challenges those convictions, asserting (1) there is insufficient evidence to support the convictions; (2) the jury should not have been instructed it could infer malice from the commission of child endangerment resulting in serious injury; (3) his first-degree murder conviction should have merged into the child-endangerment conviction, leaving the "B" felony; and (4) the court abused its discretion in admitting some of the State's evidence.

**I. Background Facts and Proceedings.**

S.K. was born on May 1, 2017, and reported dead on August 30—almost four months later. The State's chief medical examiner, Dr. Dennis Klein, performed an autopsy on August 31. He opined with a reasonable degree of medical certainty that S.K.'s death was caused by denial of critical care. S.K. died from malnutrition, dehydration, and an infection of E. coli that entered his body through his skin where it broke down due to the fact that S.K. sat in his own feces and urine for a number of days. Dr. Timothy Huntington, who has a Ph.D. in entomology (the study of insects), consulted on the case because of the flies found on and around S.K. Dr. Huntington testified the flies in question are scuttle flies, which are attracted to urine, feces, and other bodily fluids. Based on the various stages of life of the scuttle fly that Dr. Huntington was able to observe, he opined that the initial infestation began around August 20 or 21. Dr. Huntington testified, to a reasonable degree of scientific certainty, that if S.K.'s diaper or clothing had been changed since the initial infestation, the maggots and flies would not remain. In other words,

because it would take nine to thirteen days after the flies' eggs were laid to reach the state in which Dr. Huntington observed them, and he estimated it would take a day for the flies to find and reach the food source—i.e. the feces and urine in S.K.'s diaper, S.K. had been sitting in that diaper and clothing in his swing for approximately ten to fourteen days.

Koehn was charged with murder in the first degree and child endangerment resulting in death. He entered a plea of not guilty, and a six-day jury trial took place in October and November 2018.

At trial, Koehn did not challenge the evidence regarding the cause and manner by which S.K. died. Koehn maintained that S.K.'s mother, Cheyanne Harris, was the primary caretaker of S.K. and his two-year-old sibling, N.K. It was agreed in their family that Koehn was generally not responsible for changing diapers or feeding the children with a bottle. Koehn testified he was working outside the home seventy to eighty hours per week and was unaware that Harris stopped providing care for S.K. He stated he was shocked by S.K.'s death and originally assumed S.K. died from sudden infant death syndrome. Koehn testified that if he had been aware S.K.'s needs were not being met, he would have changed his diaper and fed him a bottle.

The State introduced evidence to suggest Koehn's claims of being unaware were not credible. Koehn's work log, as testified to by Koehn's employer, did not support Koehn's assertions about the number of hours he worked. Additionally, the State provided evidence of the small size of the family's apartment and the fact that Koehn and Harris's bedroom shared a wall with the one S.K. was left in, suggesting Koehn could not have been oblivious to either S.K.'s cries of distress

or the smell caused by the feces and urine S.K. sat in for one to two weeks. Koehn originally told police he heard S.K. cry around 6:00 a.m. on the morning of August 30 and that Harris then went into S.K.'s bedroom to feed him—statements he later walked back, testifying he must have dreamed those things. He also originally said he played with S.K. in S.K.'s bedroom one day before and that S.K. had interacted with him normally, grabbing onto his fingers and holding on. When asked whether it was possible or probable that S.K. was able to interact with Koehn in this way on August 29, Dr. Klein testified,

> There are possibilities that someone can—there are natural reflexes that babies have that when we put certain stimuli in. I think a normal interaction, though, as far as being able to make eye contact or follow your eye or have some sort of that engagement, given how dehydrated, malnourished and infected the child was, I would expect the child would have been noninteractive with a person who was trying to interact with them.

At trial, Koehn then testified he had his days mixed up due to working nights and he had last seen S.K. alive on August 28. There was also testimony that Koehn had questioned whether he was S.K.'s biological father. And Koehn told his friend, Jordan Clark, about his daughter and often talked about N.K. But Clark, who saw Koehn about five days per week at work and visited Koehn's apartment a few times in July 2017, was unaware that S.K. existed until after he learned of his death.

The jury convicted Koehn as charged. At sentencing, the court determined Koehn's conviction for child endangerment resulting in death merged with his conviction for first-degree murder due to the "one homicide" rule. Koehn was sentenced on only the first-degree murder charge, for which he received the mandatory sentence of life in prison.

Koehn appeals.

**II. Discussion.**

**A. Substantial Evidence.**

**1. First-Degree Murder.** Koehn challenges the sufficiency of the evidence supporting his conviction for murder in the first degree.[1] The State has the burden to prove every element of the crimes with which Koehn was charged. *See State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010). The jury was instructed that to convict Koehn of first-degree murder, it had to find:

> 1. During the timeframe of August 4, 2017, through and including August 30, 2017, the [Koehn] killed S.K.
> 2. S.K. was under the age of 14.
> 3. [Koehn] did so with malice aforethought.
> 4. [Koehn] was committing the offense of child endangerment as defined in Instruction No. 22.
> 5. S.K.'s death occurred under circumstances showing an extreme indifference to human life.

Additionally, the jury was instructed that child endangerment, as included in the fourth element, was defined as, "[Koehn] committed child endangerment if he, as the parent of S.K., intentionally committed a series of acts using torture or cruelty

---

[1] In the first section of his appellate brief, Koehn argues he is not the "but for" cause of S.K.'s death, generally relying on an argument that Harris was the historical caregiver of their children and so it was her inaction that led to the death of S.K. Insofar as Koehn uses this proposition to argue he was unaware S.K.'s needs were not being met and his own failure to meet those needs was unintentional, we address this argument in the body of the opinion dealing with Koehn's sufficiency arguments. But to the extent that Koehn seems to suggest that, because there was an agreement within his family that Harris would be the primary caretaker for the child, he is relieved of his parental and legal responsibility to provide care to the child, we note he cites no authority for such a proposition, and we do not consider it further. *Cf.* Iowa Code § 232.2(6)(g) (2017) (defining a child in need of assistance as a child "[w]hose parent, guardian, or custodial fails to exercise a minimal degree of care in supplying the child with adequate food, clothing, or shelter and refuses other means made available to provide such essentials" and allowing the State to intercede in such cases).

that resulted in bodily injury to S.K." Neither "torture" nor "cruelty" were defined in the instructions.

In reviewing whether substantial evidence supports Koehn's conviction, we review for errors at law. *See id.* "We will uphold a finding of guilt if substantial evidence supports the verdict." *Id.* And "[w]e review the facts in the light most favorable to the State, including making legitimate inferences and presumptions that may reasonably be deduced from the evidence in the record." *Id.*

First, Koehn claims there was not sufficient evidence that he "killed" S.K. He acknowledges the State only had to show his actions caused or directly contributed to S.K.'s death but maintains this burden of proof was not met because there was "no evidence he intentionally starved, dehydrated, or intentionally caused S.K.'s death." At trial and here, Koehn's defense is generally based on the claim that he was unaware S.K.'s needs were not being met by Harris, who the family agreed would be S.K.'s primary caretaker. Koehn testified as much at trial. He also showed a general awareness of the feeding and diaper changing young children require and stated he would have fed or changed S.K. if only he knew Harris was failing to do so. But the jury was not required to accept Koehn's testimony. *See State v. Hall*, 214 N.W.2d 205, 210 (Iowa 1974) ("The State rightly claims that the jury was not required to accept all of defendant's testimony.").

The State showed that the family's home was a small apartment, with just a living room, kitchen, one bathroom, and two bedrooms, which were directly off the living room and which shared a wall with one another. No point in the home was very far from the place S.K. was found dead—in a bedroom, sitting in a swing, facing a wall, while a quilt covered the only window in the warm room. Koehn

indicated that he was unaware what was happening in the home—even though he told the investigators he could hear S.K.'s cries from anywhere in the apartment—because he worked seventy to eighty hours per week. But it was undisputed he only worked five of seven days each week, and Koehn's own reports about his hours did not show he worked fourteen-hour shifts every day. Additionally, Koehn's employer testified that Koehn, who worked nights, was off from work for the weekend from the early morning hours of August 25 until he returned to work on the night of the August 27. Based on the logs of when he weighed the truck he drove as he left and returned to the plant, Koehn drove his truck for approximately four hours August 27-28, approximately nine hours August 28-29, and approximately nine hours August 29-30. Even with the additional time he had to spend at work before and after the weigh-ins, in the five days prior to S.K. being reported dead, Koehn worked less than twenty-five hours.

Other statements made by Koehn to support his lack of awareness were also called into question. Koehn initially told police that he heard S.K. cry around 6:00 a.m. on August 30 and then heard Harris go in and feed him. After it became clear this was untrue, Koehn testified he probably dreamed this. He also testified he played with S.K. on August 29 and S.K. clutched his fingers. Dr. Klein opined S.K. would not have been interactive on August 29. Koehn amended his original statement, claiming that working nights causes him to confuse his dates and that he actually played with S.K. on August 28. Koehn, who claimed to have such a sensitive nose and stomach that he could not change children's diapers, was asked how he failed to notice the smell of S.K.'s long unchanged diaper, which was soaked through with urine and feces and had also soaked the clothing and

blankets stuffed around him in the swing. Koehn stated he noticed the smell, removed several dirty diapers from S.K.'s room on August 28, and only noticed the smell again after S.K. was found dead on August 30. S.K. was almost exactly the same weight at death as he was at birth. Pictures of S.K. in his swing after he was reported dead show an emaciated child. When asked how he did not know S.K. was not being fed if he was spending time with S.K., Koehn testified that while he did interact with S.K., he never turned the overhead light on in the bedroom because it shined in S.K.'s eye uncomfortably.

Viewing the evidence in the light most favorable to the State, Koehn was home most of every day during at least the five days leading up to S.K.'s reported death. During that time, neither S.K.'s clothing nor diaper were ever changed and he was never taken out of the swing in his room. The smell of his unchanged diaper and the flies on and around him were apparent—especially in close quarters. S.K.'s emaciated appearance made it clear he was in need of food and caring. There is substantial evidence for the jury to conclude that Koehn was aware Harris had stopped feeding and caring for S.K. and yet Koehn chose to do nothing—an intentional withholding of the food and care S.K. needed to live.

Next, Koehn argues there was not substantial evidence for the jury to find malice aforethought. The jury was instructed malice could be inferred from the commission of child endangerment resulting in death. And child endangerment was defined as, "if [Koehn], as the parent of S.K., intentionally committed a series of acts using torture or cruelty that resulted in bodily injury to S.K." Neither "torture" nor "cruelty" were defined in the instructions, so the jury was allowed to use a common, lay definition. *See State v. Thompson*, 570 N.W.2d 765, 768 (Iowa 1997)

("[W]ords use in a jury instruction need not be defined 'if they are of ordinary usage and are generally understood.'" (citation omitted)).  During its closing argument, the State offered the definition as, "The callous indifference to pain and suffering." Again, there is substantial evidence in the record to support a finding Koehn was aware that S.K. was not fed, had not had his diaper changed, and was left siting in his swing looking at the wall for days on end.  Koehn's decision to do nothing to remedy this, in spite of the fact that he knew what care children require and had the necessary supplies—formula, bottles, diapers, and clean clothing—available in the home, showed callous indifference to S.K.'s pain and suffering.  These same facts support the finding Koehn manifested an extreme indifference to human life.

There is substantial evidence to support Koehn's conviction for murder in the first degree.

**2. Child Endangerment Resulting in Death.**  Koehn also challenges the sufficiency of the evidence supporting his conviction for child endangerment resulting in death.  To convict Koehn of this charge, the jury was instructed it had to find:

> 1. Between the dates of August 4, 2017 and August 30, 2017, [Koehn] was the father of S.K.
> 2. S.K. was under the age of fourteen years.
> 3. [Koehn] willfully deprived S.K. of the necessary food, water, health care or supervision appropriate for a child of S.K.'s age.
> 4. [Koehn] was reasonably able to provide food, water, health care or supervision to S.K.
> 5. As a result, S.K. suffered substantial physical harm.
> 6. S.K. died as a result of the substantial physical care.

Koehn challenges the evidence to support a finding he *willfully* deprived S.K. of necessary food, clothing, and health care.  In doing so, he reiterates his argument he was unaware Harris stopped caring for S.K.  But we have already

concluded substantial evidence supports a finding Koehn knew S.K. needed his needs to be met by someone else, that no one else was doing it, and that Koehn still did nothing. Koehn's awareness of the situation and decision not to use the available supplies in the home to feed or change S.K. is enough to infer that Koehn willfully withheld the necessary food and clothing from S.K.

Substantial evidence supports Koehn's conviction for child endangerment resulting in death.

### B. Jury Instruction.

The jury was instructed that while it had to find Koehn acted with malice aforethought in order to convict him of murder in the first degree, "malice [could] be inferred from the commission of child endangerment resulting in death." Now on appeal, Koehn argues it was improper to instruct the jury it could infer malice. And he claims that without the impermissible inference, there is not substantial evidence in the record to support a finding of malice aforethought.

But Koehn did not object to the jury instruction at his trial. "We have repeatedly held that timely objection to jury instructions in criminal prosecutions is necessary in order to preserve any error thereon for appellate review." *State v. Taggart*, 430 N.W.2d 423, 425 (Iowa 1988). "Failure to timely object to an instruction not only waives the right to assert error on appeal, but also 'the instruction, right or wrong, becomes the law of the case.'" *Id.* (citation omitted). "Where, as here, the jury was instructed without objection, the jury instruction becomes the law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes*, 910 N.W.2d 6354, 639 (Iowa Ct. App. 2018).

We note that in the section of his appellate brief regarding error preservation on this argument, Koehn recognizes he may have a problem. He states, "To the extent that error was not preserved on the jury instruction issue, the court should reach the issue on ineffective assistance of counsel or preserve this issue for further review." Koehn makes this passing statement to the framework of ineffective assistance of counsel but does not cite authority or develop an argument further. This reference is inadequate for us to consider his claim under the exception to error preservation, so we preserve his claim for possible postconviction-relief proceedings.[2] *See State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018) ("If the development of the ineffective-assistance claim in the appellate brief was insufficient to allow its consideration, the court of appeals should not consider the claim, but it should not outright reject it.").

**C. Merger.**

Koehn maintains his conviction for murder in the first degree should have merged into his conviction for child endangerment resulting in death. In other words, he argues he should have been sentenced for the "B" felony rather than the "A" felony. But Koehn never made this argument to the district court. He claims it was preserved through his motion in arrest of judgment and subsequent argument to the court, but this is disingenuous.

His filed motion states, "Count II [child endangerment] should merge with Count I [murder in the first degree]. A judgment entered on both counts violates

---

[2] Judgment was entered in Koehn's case in December 2018, well before the amended Iowa Code section 814.7 (Supp. 2019), which prevents us from considering claims of ineffective assistance on direct appeal, took effect on July 1, 2019.

Iowa Code § 701.9, and also violates the defendant's right against double jeopardy protected by the United States Constitution." And there was no argument on the issue at the sentencing hearing, which is when the court heard Koehn's motion. The following took place:

> DEFENSE: I just—I don't have much, Your Honor, but I do have a question. I believe the parties have agreed that the "B" felony merges with the—
> THE COURT : Pursuant to the one-homicide rule—
> DEFENSE: Yep.
> THE COURT: —there will be no adjudication on the child endangerment.
> DEFENSE: Obviously the State is correct, there's not much—there's nothing really for the defense to say. The sentence is mandatory so it doesn't matter how eloquent or ineloquent I am at this time. The court has no discretion whatsoever in the sentence so we have nothing further.

This argument has not been preserved, and we do not consider it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

**D. Admission of Evidence.**

Finally, Koehn challenges the district court's admission of some of the State's evidence. In this section of his appellate brief, Koehn complains about statements made by the State during its opening and testimony to which he never objected. Any alleged issues as related to that evidence has not been preserved for our review, and we do not consider it. Additionally, in the section on error preservation, Koehn again makes a passing reference to ineffective assistance of counsel, stating, "To the extent that objection was not made to the highly emotion

testimony, the standard of review is for ineffective assistance of counsel."[3] Without setting out the applicable law, citing authority, or developing an argument under the framework of ineffective assistance, any claim under that framework is not adequately developed for our review. If he wishes, Koehn can bring those claims in an action for postconviction relief.

Even regarding the evidence that Koehn did object to, the record before us is minimal at best. Koehn filed a motion in limine stating, "Photographs of the decedent's corpse or of the autopsy are not relevant and any probative value of such photographs is outweighed by the prejudicial impact of the photographs." We do not have a record of any hearing that was held regarding this motion. In the court's written ruling, it stated:

> The court has not seen any of the proposed photographs nor does the court know how many photographs the State intends to offer. However, photographs of the child at the scene and of the autopsy are relevant and so long as not overdone, admissible. The photographs are undoubtedly gruesome and unpleasant but that fact does not make them inadmissible.

At trial, when the State moved to admit exhibits 100 through 118—photographs Koehn now challenges—Koehn simply stated, "Object for reasons previously stated." The court, relying on its ruling on the motion in limine, admitted the photos.

---

[3] Koehn's appellate attorney had access to the same record we do. It is not difficult to ascertain when Koehn lodged an objection and when he sat silently and allowed evidence to be admitted without challenge at trial. Counsel should be more diligent in determining what claims have been preserved in making arguments on appeal. Otherwise the "preservation of error" section, as required by appellate rule, becomes meaningless. *See* Iowa R. App P. 6.903(2)(g) (requiring the "argument section" to include "[a] statement addressing how the issue was preserved for appellate review, *with references to the places in the record where the issue was raised and decided*" (emphasis added)).

Like at trial, Koehn does not challenge the admission of any specific photo. He has not narrowed down which he believes crossed the line as cumulative or too prejudicial. While photographs of small, dead children are likely to elicit emotion from the jury, "[d]eath pictures are not ordinarily excluded because they are gruesome, as these pictures are, for murder is by nature gruesome business." *State v. Hickman*, 337 N.W.2d 512, 515–16 (Iowa 1983). The question is whether the pictures were relevant. *See id.*; *see also* Iowa R. Evid. 5.401 ("Evidence is relevant if . . . [i]t has any tendency to make a fact more or less probable than it would be without the evidence; and . . . [t]he fact is of consequence in determining the action."). Generally, pictures of S.K. as he was found in the swing were relevant. It showed the jury what S.K. looked like at the time—emaciated—and how he had been left to sit for days on end—in a swing, facing a wall in a dark room. The photos also gave the jury some idea of the extent to which S.K.'s diaper and clothing were soiled. The jury could use this information in evaluating Koehn's claims he was totally unaware that S.K.'s needs were not being met. And the photos that included maggots and various life cycle of the scuttle flies were needed by the entomologist, Dr. Huntington, to form an opinion how long S.K. had been sitting in his soiled diaper. His opinions, and the photographs he relied upon to form them, were necessary for the State to show the length of time S.K. had been left to sit in his room without being moved, fed, or changed. This information was necessary in considering Koehn's intent and whether malice was proved.

As we cannot say none of the photos taken of S.K. after his death or during the autopsy were relevant and Koehn has not specifically challenged the admission of any one photograph, the district court did not abuse its discretion in

admitting the challenged evidence. *See State v. Helmers*, 753 N.W.2d 565, 567 (Iowa 2008) (providing that evidentiary rulings are generally reviewed for an abuse of discretion).

**III. Conclusion.**

Having considered Koehn's claims that were preserved and sufficiently formulated to enable review, we affirm his convictions for murder in the first degree and child endangerment resulting in death. We preserve any claims of ineffective assistance for possible postconviction-relief proceedings.

**AFFIRMED.**