STATE of Iowa, Appellee,

v.

Bernard Richard HICKMAN, Appellant.

No. 67773.

Supreme Court of Iowa.

Aug. 17, 1983.

Francis C. Hoyt, Jr., Appellate Defender, and Patrick R. Grady, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Joseph P. Weeg, Asst. Atty. Gen., and William E. Davis, County Atty., for appellee.

Before REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, LARSON and WOLLE, JJ.

UHLENHOPP, Justice.

This appeal involves several legal problems which arose in a first-degree murder prosecution.

In 1975 defendant Bernard Richard Hickman was convicted in Lucas County of assault with intent to rape and was sentenced to imprisonment. In that instance he slashed the victim's throat and left her partially clothed. She recovered. He was paroled from prison in about five and one-half years.

Viewing the evidence in the present case in the light most favorable to the verdict of guilty, the jury could find the facts as follows. In September 1981 defendant and Louise Sheerin were employees in a Holiday Inn restaurant in Bettendorf, Iowa. After working the evening shift on September 4, defendant socialized with other employees that night. Without retiring, he returned to work as cook in the restaurant shortly after five o'clock the next morning, followed soon by Sheerin and by Brian Walford, another employee. Defendant began to "prep" the kitchen for the first meal, and took a plate of food to the night auditor. The auditor sent the food back because the roast beef was too rare.

The parties make divergent claims at this point. Defendant claims that Sheerin made certain remarks and gave him a certain "look" encouraging sexual relations, the two then went into the men's rest room, Defendant took a kitchen knife with him, Sheerin disrobed and defendant did so from the waist down, and they engaged in sexual intercourse. Defendant testified:

Q. Did you see her get dressed? A. As I put my boots on and picked up the knife that I carried into the bathroom with me, she had her underpants on and was reaching to the sink where she had her clothes put and had picked her clothes up.

Q. Do you know what she did with her clothes when she took them out of the sink? A. She was just holding them then.

Q. At that point, Mr. Hickman, was there any conversation between you and

Miss Sheerin? A. She made a comment, yes.

Q. What was that comment? A. She said that I made love fucked up like I make roast fucked up.

Q. Was that when she was getting dressed and you were already dressed? A. That's when I was completely dressed and she had her clothes in her hand.

Q. How did you feel? A. I felt a rage go over me, an anger.

Q. What did you do? A. Swung back and struck her.

Q. What hand did you hit her with? A. The left hand.

Q. What hand was the knife in? A. The left hand.

Q. Do you recall striking her that first time? A. Yes, I do.

Q. Do you recall where you struck her? A. Side of the head.

Q. Do you know what side of her head? A. I believe the left side of the head—or, right side. I am not clear.

Q. You just struck her? A. Yes, I did.

Q. Do you remember hitting her that first time? A. Yes, I do.

Q. What happened after that? A. I don't recall.

Q. Do you recall Miss Sheerin at any time with her hands up trying to stop you or strike you? A. No, I don't.

Q. Do you recall at that point striking her again? A. No.

Q. Do you recall at that point anything you may have done? A. No.

Q. What is the next thing you remember? A. Putting the sheet pans of bacon in the oven.

The State claims, on the other hand, the jury could reasonably infer that defendant, with the knife, forced Sheerin to go into the rest room and to have intercourse, and slew her in the process.

The parties do not disagree materially about subsequent events. Defendant, who had blood on his shirt, told the night auditor that the waitress was in the rest room and that he should call the police and an ambulance. The auditor called the police and found Sheerin dead in the rest room, bloodied, face down, and clad only in panties.

After the occurrence defendant went to his car, drove to a filling station and obtained gasoline, drove off without paying for it, was apprehended by an officer for that offense, and told the officer to send an ambulance to the Holiday Inn because a waitress had been stabbed.

At trial, the county medical officer testified Sheerin sustained at least thirty-nine stab wounds, some inflicted after death. She died from severe blows to the head and neck, and loss of blood.

The county attorney charged defendant with murder with premeditation or while participating in the forcible felony of sexual abuse. A jury found defendant guilty of first-degree murder, the trial court sentenced him to life imprisonment, and he appealed.

I. *Change of venue.* Defendant moved unsuccessfully before and at trial for a change of venue, on grounds of due process and rule 10(9)(*b*) of the rules of criminal procedure:

> *Venue.* If the court is satisfied from a motion for change of venue and evidence adduced in support thereof that such prejudice exists in the county in which the trial is to be had that there is a substantial likelihood a fair and impartial trial cannot be had there, the court shall transfer the proceeding to another county in which no such situation exists.

We stated our manner of review of rulings on such motions in *State v. Love,* 302 N.W.2d 115, 122 (Iowa 1981) (citations omitted):

> Our scope of review on the question is unique. We look to the record de novo and, on that basis, determine whether the trial court abused its discretion. Under Iowa R.Crim.P. 10(9)(b) a change of venue must be granted when the court is satisfied such prejudice exists in the county of a scheduled trial that there is a "substantial likelihood a fair and impartial trial cannot be had there."

In support of the motion, defendant showed that eight articles appeared in local newspapers in a three-week period less than two months before trial. Seven of the articles mentioned defendant's prior conviction in Lucas County, three dealt with defendant's parole from that sentence, two contained interviews with that victim, and another contained communications by the prior officers concerning defendant's being released from incarceration. Two articles were critical of the parole system and one advocated return to capital punishment. In addition, two local lawyers practicing in the criminal field opined that defendant could not get a fair trial in the county.

The State caused a public survey to be made by a research firm, and introduced the findings at the hearing on the motion. These showed that eighty-two percent of the sample interviewed were aware of the victim or that a murder had occurred. Of these, sixty-eight percent had formed no opinion of defendant's guilt or innocence, two percent were undecided, and thirty percent said they could put aside their opinions.

In the selection of the jury, each prospective juror was examined separately from the jury panel, and the court had the voir dire of each juror reported. The court invariably sustained challenges for cause to jurors who had opinions on the case.

■ We have read the voir dire examination of the jurors. We are impressed with the jurors' candor. The worst that can be said of the jury finally selected is that six members had been exposed to some media coverage of the event, two knew one of the prosecutors or his family, and one had a cousin who was murdered twenty years previously. But from their voir dire examinations, we are abidingly convinced that the jurors selected, including these nine jurors, would give defendant a fair trial.

Publicity about a defendant's prior criminal record does not per se disqualify jurors. *Murphy v. Florida,* 421 U.S. 794, 803, 95 S.Ct. 2031, 2038, 44 L.Ed.2d 589, 596–97 (1975). We reviewed the considerations which govern motions for change of venue for actual or presumed prejudice in *State v. Johnson,* 318 N.W.2d 417 (Iowa 1982). On the record initially presented to the trial court on this issue, considered in light of the subsequent thorough, separate, and reported voir dire of each juror, we uphold the trial court's ruling refusing a change.

■ Defendant renewed his motion during voir dire on the ground that one juror had communicated with the victim's mother, and had mentioned this fact to other prospective jurors. The trial court promptly investigated the incident in the presence of counsel and ascertained, rightly, that no harm had been done. The same is true of a television story which appeared the night before trial.

■ During trial defendant again renewed his motion on the ground that the presence of the victim's family in the courtroom inflamed and prejudiced the jury. Without deciding whether this is a ground for change of venue—presumably the family would seek to attend the trial in another county to which it would be moved—the record does not support a claim of abuse of discretion by the trial court. *Cf. State v. Love,* 302 N.W.2d 115, 122 (Iowa 1981) (trial court's discretion on such motions).

We do not find error in the trial court's rulings on the motion to change the venue.

II. *Photographs.* The State had a number of pictures of the crime scene, Sheerin's body, and details of the autopsy, and offered them into evidence. The trial judge went through them and eliminated those where he deemed the gruesomeness outweighed the value of the pictures as evidence. Defendant objected to several which were admitted into evidence, and to two in particular relating to the autopsy. He contends that the trial court erred in admitting them.

■ The basic test is relevancy of the pictures. *State v. Fuhrmann,* 257 N.W.2d 619, 624–25 (Iowa 1977). Death pictures are not ordinarily excluded because they are gruesome, as these pictures are, for

murder is by nature gruesome business. *State v. Seehan,* 258 N.W.2d 374, 378 (Iowa 1977). Trial courts have discretion in determining whether the value of pictures as evidence outweighs their grisly nature. *State v. Fryer,* 243 N.W.2d 1, 7 (Iowa 1976).

A medical witness testified in detail, largely without objection by defendant, describing the body, the wounds, the autopsy, and conditions in the body revealed by the autopsy. Some of the pictures illustrated this testimony and made it graphic and comprehensible. *See State v. Coburn,* 315 N.W.2d 742, 746 (Iowa 1982). The pictures demonstrated the ferociousness of the attack on the woman and supported the State's claims of malice and of intent to kill. The trial court submitted voluntary and involuntary manslaughter to the jury as included offenses, and the pictures buttressed the State's claim that defendant's acts went far beyond those crimes. We conclude that the trial court did not abuse its discretion in holding, as to the pictures admitted, that their gruesome effect did not outweigh their evidentiary value, especially as illustrating the testimony of the medical witness and as demonstrating viciousness in connection with the State's claims of malice and intent.

III. *Rebuttal evidence.* One of the bases of the State's charge of first-degree murder was murder in the perpetration of sexual abuse. In his defense, defendant testified in substance that the sexual intercourse was consensual.

The State relied of course on its evidence of violence to disprove that the intercourse was consensual. To reinforce that evidence, the State introduced testimony by a psychiatrist who had made a study of the psychology of rapists and had examined defendant and his medical history. The psychiatrist described various kinds of rapists and characterized defendant as of the class of aggressive, antisocial or sociopathic, hatred rapists.

Defendant objected to this testimony as not rebuttal and argues that the trial court should not have admitted it. We agree

with the trial court, however, that this testimony was admissible as rebutting defendant's claim of consensual intercourse. *See State v. Nelson,* 261 Iowa 204, 209, 153 N.W.2d 711, 714 (1967) ("Rebutting evidence is that which explains, repels, controverts, or disproves evidence produced by the other side.").

IV. *Insanity, diminished responsibility.* Defendant argues finally that the trial court erred in refusing to submit to the jury the issue of insanity as a complete defense and diminished responsibility as a defense to premeditated murder.

A. The defense of insanity is now statutorily defined in terms of the M'Naghten test, in section 701.4 of the Code:

No person shall be convicted of any crime if at the time such crime is committed the person suffers from such a diseased or deranged condition of the mind so as to render the person incapable of knowing the nature and quality of the act he or she is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

Defendant's trial counsel misapprehended the manner in which insanity becomes a jury issue in a criminal trial. Neither the State nor defendant introduced substantial evidence that defendant was insane within the test in section 701.4. *See State v. Donelson,* 302 N.W.2d 125, 135–36 (Iowa 1981) (defendant's inability to remember stabbing not substantial evidence of insanity); *State v. Booth,* 169 N.W.2d 869, 871–72 (Iowa 1969) (defendant's inability to distinguish right from wrong when intoxicated); *cf. State v. Harkness,* 160 N.W.2d 324, 329–30 (Iowa 1968) (partial amnesia at time of shooting plus inability of physician to say if defendant was sane "enabled if not compelled" jury to find sanity). In asking the trial court to submit the insanity issue to the jury, defendant's trial counsel stated:

I think, Your Honor, in this particular case it was raised by a couple ways. One is us giving notice, as required by statute.

And, number two, by the State putting in evidence that at the time of the alleged offense in their expert's opinion, Mr. Hickman was sane. I think once it gets that far, then it is up to the jury to decide whether he was or whether he was not. It also is up to them at that point to decide the issue of diminished responsibility. I think at that point they put it in.

Defense counsel confused (1) making insanity an issue in the case so that evidence of insanity would be admissible, and (2) actually introducing evidence of insanity. We have the second aspect here. We dealt with that aspect in *State v. Thomas,* 219 N.W.2d 3 (Iowa 1974). We there adopted the common-law rule laid down in *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). We stated:

> [I]f the defendant's sanity is drawn in issue and substantial evidence appears in the record raising a fact question under the M'Naghten test—regardless of the source of that evidence—then the burden devolves upon the State to prove the defendant's sanity beyond a reasonable doubt by all the evidence in the case including the presumption of sanity. As stated conversely in the *Davis* case regarding the jury's duty, "If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged."

219 N.W.2d at 5, quoting *Davis* at 488, 16 S.Ct. at 358, 40 L.Ed. at 506. We adhered to *Thomas* in *State v. Donelson,* 302 N.W.2d at 135–36.

■ Applying the rule in *Thomas,* the record here does not contain *substantial* evidence from any quarter that defendant was insane within the M'Naghten test, which is now the statutory test. Similarly the record does not contain *substantial* evidence that defendant was incapable of formulating the intent which is necessary for premeditation. Insanity and diminished responsibility are simply not in the case. The trial court was right in refusing to submit them to the jury.

After examining the record, we are convinced that the trial court endeavored to provide defendant a fair trial throughout, and succeeded. We thus uphold the conviction and sentence.

AFFIRMED.