# IN THE COURT OF APPEALS OF IOWA

No. 22-1074
Filed July 24, 2024

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**DAISHAWN QUINCELL GILLS,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Celene Gogerty, Judge.

A criminal defendant appeals his convictions for first-degree murder and first-degree robbery. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Kyle Hanson (until withdrawal) and Genevieve Reinkoester, Assistant Attorneys General, for appellee.

Heard by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

"They got to go." That's what Daishawn "Dai Dai" Gills announced to his compatriots before he and co-defendant Emmanuel "Dutch" Totaye shot three teenage boys with a handgun and shotgun then left their bodies stacked in a bedroom closet. We discussed the facts of the offense in greater detail in Totaye's appeal, also decided today. *See State v. Totaye*, No. 22-1169, 2024 WL _____ (Iowa Ct. App. July 24, 2024). Because the two were charged and tried jointly, we repeat only the facts relevant to Gills's claims on appeal.

Gills and Totaye's accomplice Leontreal "Trel" Jones turned State's evidence some six months after the triple-homicide and implicated them in the robbery and murder of M. Swanks, D. Swanks, and T.W.[1] Jones told the jury that, based on a dispute over forty dollars, Gills and Totaye armed themselves with a .380 handgun and a shotgun before they entered the Swanks home, robbed the Swanks brothers and T.W., and herded them into a bedroom closet. Jones heard Gills say "they got to go," which Jones understood to mean "somebody going to die." According to Jones, he then expressed he did not want to participate in murder and left the house. The last thing Jones saw before leaving the house was the Swanks brothers and T.W. in the closet, and the last thing he heard was gunfire. Soon after, Gills and Totaye returned to Gills's Malibu—the getaway car—with the .380 handgun, the shotgun, and bags of stolen property.

At this point, Jones heard Totaye say he "heard somebody still breathing," and Gills retrieved the shotgun then went back into the house. When Gills came

---

[1] We use initials for the minor victims.

back outside, he remarked "the gun had no kickback to it" and that he either "saw the brains" or "shot the brains." According to Jones, he, Totaye, and Gills then went to Totaye's house with the stolen property, where they "split everything up" and "smoked a blunt."

The subsequent police investigation corroborated various aspects of Jones's timeline and linked Gills and the .380 handgun to a drive-by shooting the next day. Police found Gills in possession of two cardboard boxes containing a spent casing matching the .380 handgun and property stolen from the Swanks house. Officers also discovered two full quart-sized bottles of lighter fluid in Gills's girlfriend's purse. And police recovered other stolen property from Totaye's house.

During a police interview, Gills denied involvement and insisted he was taking the cardboard boxes to his "auntie's"—but couldn't say where she lived. When a detective asked why his girlfriend had lighter fluid, Gills said it was for a "barbecue." He also denied possession of any stolen property from the Swanks house. And his girlfriend told police and later the jury that Gills directed her to obtain the lighter fluid.

Autopsies established the Swanks brothers and T.W. died from gunshot wounds. And the manners of death were ruled homicide.

The Polk County Attorney charged Totaye and Gills jointly with three counts of first-degree murder, class "A" felonies in violation of Iowa Code sections 707.1 and 707.2 (2020) with a weapons enhancement under section 902.7, and three counts of robbery in the first degree, class "B" felonies in violation of Iowa Code sections 711.1 and 711.2, also with a weapons enhancement under section 902.7.

4

Totaye and Gills were tried jointly. The jury found Gills guilty as charged but found Totaye guilty of the first-degree robberies and the lesser-included offenses of second-degree murder. Gills appeals, challenging the district court's denial of a motion to strike a potential juror for cause during voir dire and admission of certain autopsy photos at trial.

## I.      Jury Selection

As a preliminary observation, we note the State sought retention on the basis that the supreme court should reconsider the prejudice analysis and procedure relating to prospective-juror challenges for cause set forth in *State v. Jonas*, 904 N.W.2d 566, 576–83 (Iowa 2017). We, of course, cannot overturn supreme court precedent. *See State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990). So we apply *Jonas*.

"The district court is vested with broad discretion" in deciding challenges to potential jurors for cause and we reverse only upon finding an abuse of that discretion. *See Jonas*, 904 N.W.2d at 571. In other words, our review does not ask whether we would have struck a particular juror for cause; only whether the district court appropriately exercised its broad discretion. *See id.*

Gills focuses on Juror 40. He asserts this juror "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." Iowa R. Crim. P. 2.18(5)(k). A challenge under this rule asks "whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant." *State v. Linderman*, 958 N.W.2d 211, 218 (Iowa Ct. App. 2021) (quoting *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985)).

Juror 40 reported she had been the victim of an unrelated bank robbery a bit more than two years before this trial. Her questions and answers given during individual voir dire are not a model of clarity, so we reproduce the relevant portion rather than paraphrase:

> JUROR NUMBER 40: I was involved in a bank robbery [about two years ago] . . . .
> [THE STATE]: Was that here in Des Moines?
> JUROR NUMBER 40: Yes.
> [THE STATE]: And we didn't see that on your jury slip.
> JUROR NUMBER 40: You didn't ask me that question, really.
> [THE STATE]: This is, as you know, a case where these folks are charged with murder and robbery.
> JUROR NUMBER 40: Yes.
> [THE STATE]: The fact that you have been a victim of a crime, specifically this bank robbery, how do you think that will affect your ability to be a juror in this case?
> JUROR NUMBER 40: It's still pretty fresh in my mind, so it's going to affect it, unfortunately.
> [THE STATE]: How so?
> JUROR NUMBER 40: I still think about it quite a bit. A guy had a gun. He walked into the bank and asked for the money. I was okay until after the robbery. It's still pretty fresh.
> [THE STATE]: I understand that. You understand that that series of events has nothing to do—
> JUROR NUMBER 40: Yes, yes.
> [THE STATE]: —to do with this case?
> JUROR NUMBER 40: Yes.
> [THE STATE]: How do you think that would impact your ability to judge this case based on this evidence?
> JUROR NUMBER 40: How—I don't know for sure. I don't want to give somebody an unfair trial if that stuff is going to come back to me.
> [THE STATE]: And we appreciate that, and we don't want you to either. Has anybody been arrested for that?
> JUROR NUMBER 40: Yes. They were caught within five minutes.
> [THE STATE]: Have they been—so they've been charged, then?
> JUROR NUMBER 40: They're in prison already. It's over.
> [THE STATE]: That's all I have for you. Thank you, ma'am.
> THE COURT: [Gills's counsel], do you have any questions?
> [COUNSEL FOR GILLS]: Yes. Good morning. Is your concern that you will give someone in this trial an unfair—

JUROR NUMBER 40: I believe I could still. I don't know that I would. I don't want to be—

[COUNSEL FOR GILLS]: Let me word that better.

JUROR NUMBER 40: I understand.

[COUNSEL FOR GILLS]: You did? Okay. Because it was poorly worded on my part.

JUROR NUMBER 40: No, you're fine. I'm concerned about that.

[COUNSEL FOR GILLS]: You said you did not put it on the form because—

JUROR NUMBER 40: I didn't have a question for that.

[COUNSEL FOR GILLS]: You didn't believe the form was asking for that information; is that correct?

JUROR NUMBER 40: Right.

[COUNSEL FOR GILLS]: And then at what point during these proceedings did it—

JUROR NUMBER 40: Well, it kind of just flooded last night. Oh, my gosh. I heard you say "robbery," but I guess it didn't come up until I thought, "Oh, my goodness. Maybe I couldn't be impartial," so—

[COUNSEL FOR GILLS]: That was the concern that you had, that you could not be—

JUROR NUMBER 40: Yeah.

[COUNSEL FOR GILLS]: And I'm sorry, Juror 40. Will you make sure I'm done speaking before you answer?

JUROR NUMBER 40: Sure.

[COUNSEL FOR GILLS]: And I'll do the same. I know it's not how we talk in real life, but it makes it a lot harder for our court reporter. Last night, you said it kind of all hit you and came flooding back; is that right? Is that a yes?

JUROR NUMBER 40: Yes.

[COUNSEL FOR GILLS]: And your concern was you could not be fair and impartial?

JUROR NUMBER 40: Yes.

[COUNSEL FOR GILLS]: And does that mean that if you hear evidence that there was a robbery that involved a gun in this case, that you would not be able to assess that information with a—an impartial mind?

JUROR NUMBER 40: Yes.

[COUNSEL FOR GILLS]: If the judge were to ask you to take an oath that you would commit to being fair and impartial, knowing what you know and having the experience that you've had, could you do that with absolute certainty?

JUROR NUMBER 40: I don't think so.

[COUNSEL FOR GILLS]: Do you think that you would be able to render satisfactory jury service in this particular case?

JUROR NUMBER 40: I don't think so.

[COUNSEL FOR GILLS]: And that's because of your experience and this being a robbery?

JUROR NUMBER 40: Yes.

[COUNSEL FOR GILLS]: Thank you for sharing that with us. I don't have any further questions.

THE COURT: [Counsel for Totaye]?

[COUNSEL FOR TOTAYE]: Thank you, Your Honor. Juror 40, I have a couple of questions. Just to be clear, are you saying that you would be biased in favor of the prosecution and against the defendants?

JUROR NUMBER 40: I can't say that, because I don't know what I would do. I mean, it just—I can't be positive I wouldn't be.

[COUNSEL FOR TOTAYE]: Okay. So let me flesh this out. The fact that you were a victim of a bank robbery, would that somehow make you biased in favor of individuals accused of robbery here today? No?

JUROR NUMBER 40: I don't know. It's a question I can't answer, because I—like I said, I don't remember—it kind of flooded in on me last night, and I'm thinking, "Oh, my goodness. You know, maybe I can't do this."

[COUNSEL FOR TOTAYE]: Okay. In this case, if you're called as a juror, you will undoubtedly see photographs that are quite gruesome. Do you think that your experience of being at—the victim of a bank robbery would allow you to view that evidence objectively and fairly?

JUROR NUMBER 40: Again, I don't know.

[COUNSEL FOR TOTAYE]: And just to be clear about what happened here. Last night, you sort of had this come back and relive this bank robbery last night; right?

JUROR NUMBER 40: Right.

[COUNSEL FOR TOTAYE]: And this morning, you informed the court attendant that you had this other information you wanted to share with us?

JUROR NUMBER 40: Yes.

After this record, Gills's counsel challenged Juror 40 for cause under Rule 2.18(5)(k), and Totaye's counsel joined. The district court denied the challenge, ruling: "I believe she meets the standard for minimum jury service under the Code. I don't believe this rises to the level [of a] challenge for cause, so that motion is denied." Gills's counsel later used a peremptory strike on Juror 40, requested an additional peremptory strike, and specified the juror she would have

struck instead if had Juror 40 been stricken for cause. The parties agree this was sufficient to preserve error under *Jonas*, 904 N.W.2d at 583–84.

As a general proposition, we agree with courts around the country that whether crime victims can serve on a jury deciding guilt on the same or similar offense is a fact-driven inquiry depending on the potential juror and the charges at issue in each criminal trial. *See* Annotation, *Fact That Juror in Criminal Case, or Juror's Relative or Friend, Has Previously Been Victim of Criminal Incident as Ground of Disqualification*, 65 A.L.R. 4th 743, § 7 (1988). There is no blanket prohibition on a former crime victim serving on a jury deciding guilt on a same or similar offense. *Cf. State v. Doorenbos*, No. 19-1257, 2020 WL 3264408, at *7 (Iowa Ct. App. June 17, 2020) ("Familiarity with the trial topic is different from a bias against the defendant or a preconceived view of his guilt."). We also emphasize the challenge in this appeal is cabined only to Rule 2.18(5)(k). Gills does not assert, and did not preserve error on, any claim grounded in Rule 2.18(5)(m), which at the time of trial was limited to cases in which the juror "is . . . a complainant against any other person indicted for a similar offense" and was later amended to limit service when the potential juror was "the victim of a similar offense within the preceding year." *Compare* Iowa R. Crim. P. 2.18(5)(m) (2022) *with* Iowa R. Crim. P. 2.18(5)(m) (as amended July 1, 2023).

As shown above, Juror 40's answers during individual voir dire are not particularly clear. Several exchanges are open to multiple interpretations, and the cross-talk doesn't help. In reviewing a cold record, we lack the advantaged position of the district court to observe live testimony. *See State v. Williams*, No. 21-1772, 2022 WL 16985147, at *4 (Iowa Ct. App. Nov. 17, 2022) ("The

subtext, tone of voice, and demeanor of the jurors are relevant and not apparent from a transcript."). In confining our review to the words used by the potential juror, as we must, we do not identify any formation or expression of a fixed opinion on guilt or innocence as required to strike a juror for cause under Rule 2.18(5)(k). *See Linderman*, 958 N.W.2d at 218. Certainly this potential juror was reluctant to serve and had some heartburn about it. But neither of those facts is enough to support a challenge for cause. *See id.* We also put some stock in the one-year limitations period recently added to Rule 2.18(5)(m), which suggests that a one-year cooling-off period following victimization in a similar offense is generally sufficient to safeguard against disqualifying bias, to say nothing of the higher requirement required by Rule 2.18(5)(k)—a fixed opinion on guilt or innocence.

In surveying precedent, we have not found any modern Iowa case on all fours with this peculiar voir-dire exchange. And apparently neither have the parties—which is perhaps unsurprising, given the record-dependent nature of the inquiry. Gills points in part to *Jonas* and *State v. Neuendorf*, 509 N.W.2d 743 (Iowa 1993) to support his claim, but the facts in those cases don't quite line up. The *Jonas* potential juror "repeatedly expresse[d] actual bias against the defendant." 904 N.W.2d at 575. And the *Neuendorf* potential juror expressed that, based on a newspaper report of a co-defendant being found guilty, the potential juror thought Neuendorf "probably [was] equally as guilty." 509 N.W.2d at 745. Here, Juror 40 was equivocal about almost everything and did not express any opinion as to guilt or bias against Gills. To the contrary, she denied she was biased in favor of either party. Neither *Jonas* nor *Neuendorf* support Gills.

To the extent there is any analog in the case law, we see some parallels with *State v. Simmons*, where the supreme court recognized "*reservation* about impartiality" was insufficient to disqualify a juror for cause under what is now Rule 2.18(5)(k). 454 N.W.2d 866, 868 (Iowa 1990). We would generally characterize Juror 40 as expressing a similar reservation. We also find some commonalities with our recent unpublished decision in *State v. Boat*, where a juror made a variety of equivocal statements, such as agreeing it would be "hard for [her] to be fair and impartial," and we affirmed denial of a challenge for cause in part based on deference to the district court's privileged position to observe "the questions and answers live, while watching [the potential juror's] demeanor." No. 21-0934, 2024 WL 466562, at *3, *5 (Iowa Ct. App. Feb. 7, 2024). Given this case law and the district court's broad discretion on matters pertaining to jury selection, Gills has not established reversible error. As a result, we affirm without reaching the *Jonas* prejudice analysis.

## II.    Autopsy Photos

Gills also challenges the admission of certain autopsy photos at trial, urging they were cumulative as well as substantially and unfairly more prejudicial than probative. *See* Iowa R. Evid. 5.403. The State resists, taking a different view of the issue and urging Gills "was not entitled to sanitize the photographic proof of his gruesome offenses." We review the district court's ruling on these objections for an abuse of discretion. *State v. Hickman*, 337 N.W.2d 512, 516 (Iowa 1983).

"Death pictures are not ordinarily excluded because they are gruesome . . . for murder is by nature gruesome business." *Id.* at 515–16; *accord State v. Brown*, 397 N.W.2d 689, 700 (Iowa 1986) ("That the autopsy photographs were

themselves somewhat gruesome does not render them inadmissible. Murder is often a gruesome affair giving rise to equally gruesome evidence.").

Our appellate courts have a long history of affirming the admission of autopsy photos. *See, e.g.*, *Brown*, 397 N.W.2d at 700; *State v. Allen*, 348 N.W.2d 243, 247 (Iowa 1984); *Hickman*, 337 N.W.2d at 516; *State v. Fuhrmann*, 257 N.W.2d 619, 625 (Iowa 1977); *State v. Fryer*, 243 N.W.2d 1, 7 (Iowa 1976); *State v. Hunter*, No. 21-1325, 2022 WL 10827449, at *7 (Iowa Ct. App. Oct. 19, 2022); *State v. Sassman*, No. 21-0434, 2022 WL 4361785, at *4 (Iowa Ct. App. Sept. 21, 2022); *State v. Armsted*, No. 19-1883, 2021 WL 1016575, at *4–5 (Iowa Ct. App. Mar. 17, 2021); *State v. Teoh*, No. 19-0924, 2021 WL 603228, at *2 (Iowa Ct. App. Jan. 21, 2021); *State v. Koehn*, No. 18-2216, 2020 WL 6480860, at *6–7 (Iowa Ct. App. Nov. 4, 2020); *State v. Wadsworth*, No. 19-0698, 2020 WL 2487618, at *3 (Iowa Ct. App. May 13, 2020). Gills cites no Iowa case finding an abuse of discretion in these circumstances. And we see no compelling reason why this case should be the first.

Gills hangs much of his argument on a belief that cause and manner of death were not seriously disputed at trial, so he should have been able to preclude the State from offering autopsy photos to prove the related elements of first-degree murder. But our case law forecloses his claim. Even if Gills had formally conceded the relevant elements at trial (and he did not), a "[d]efendant's concession of an issue does not preclude the State from presenting evidence to establish that element of the crime." *State v. Gibb*, 303 N.W.2d 673, 682 (Iowa 1981); *see also Hunter*, 2022 WL 10827449, at *7 (affirming admission of autopsy photos even though the nature of injuries and cause of death were "uncontested").

We are similarly unpersuaded by Gills's complaint that some of the more gruesome aspects of the photos—such as organs removed from the body—were not caused by his acts but rather a product of the medical examiner's work. The autopsy procedure was thoroughly explained to the jury through the medical examiner's trial testimony, which negates any concerns about the jury mistakenly attributing postmortem medical work to Gills. And the medical examiner's explanation of the injuries revealed during the autopsy was probative on causation and intent to kill, given the extent of the inflicted injuries and that some could not be seen from an external examination.

We have considered the admission of the autopsy photos in the context of the medical examiner's entire testimony and the broader context of the trial, and we do not believe the photos' presentation was inflammatory or directed solely to the passions of jurors. The medical examiner's discussion of the evidence was clinical, and the photos conveyed more than words alone, undercutting any claim the evidence was irrelevant, immaterial, or cumulative. We agree with the district court that the danger of unfair prejudice from these photos did not substantially outweigh their probative value. And as part of this determination, we note the crime-scene photos (admitted without objection) were arguably as or more gruesome and the autopsy photos were used only during the medical examiner's testimony to aid jurors' understanding of the autopsy and related findings. From this, we conclude the danger of inflaming the jury was limited, given the nature of the crime and other already-admitted evidence. We discern no basis for exclusion of the autopsy photos under the rules of evidence urged by Gills.

As a final observation on Gills's cumulative objection, we recognize the leading Iowa evidence treatise flags that the "cumulative" language in Rule 5.403 "appear[s] more directed toward judicial discretion in controlling the trial process and expedition of case resolution in an overloaded judicial system" than a basis for exclusion. 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.403:1 (West 2022). This adheres to our controlling case law, which recognizes "[e]vidence is not inadmissible simply because it is cumulative." *State v. Maxwell*, 222 N.W.2d 432, 435 (Iowa 1974). To the extent we can engage in significant appellate review of a trial court's ruling on whether certain evidence is cumulative, there is no basis for reversal here.

**AFFIRMED.**