# IN THE COURT OF APPEALS OF IOWA

No. 24-1295
Filed December 3, 2025

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**JESSE WILLIAM SMITH,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Pottawattamie County, Michael Hooper, Judge.

　　　A defendant appeals his conviction for third-degree sexual abuse. **AFFIRMED.**

　　　Martha J. Lucey, State Appellate Defender, and Ella M. Newell (argued), Assistant Appellate Defender, for appellant.

　　　Brenna Bird, Attorney General, and Sheryl Soich (argued), Assistant Attorney General, for appellee.

　　　Heard at oral argument by Greer, P.J., and Chicchelly and Buller, JJ.

**GREER, Presiding Judge.**

A jury convicted Jesse Smith of sexual abuse in the third degree. On appeal, Smith challenges (1) the sufficiency of the evidence supporting his conviction, (2) the district court's decision to admit certain exhibits during trial, and (3) the district court's decision to allow certain testimony from the state medical examiner during trial. On our review, we find substantial evidence supported the conviction of sexual abuse, rejecting Smith's claim over the failure to prove N.S. was alive. Because we find that the district court properly exercised its discretion in admitting the photographic and video footage exhibits and in allowing testimony from the medical examiner about N.S.'s fentanyl overdose, we also reject Smith's challenges on those issues. We affirm the conviction.

## I. Background Facts and Proceedings.

On September 7, 2023, Smith went to the Super 8 Motel in Council Bluffs, Iowa, to help move recently delivered boxes of furniture. Smith arrived at the motel sometime between 10 a.m. and 12 p.m. Smith's work consisted of helping unload boxes from the delivery truck and moving the boxes to each of the floors of the motel.

That day, N.S. was working at the motel as a housekeeper.[1] N.S. was assigned guest rooms to clean on the second floor, and she began her cleaning assignment around 9 a.m.

At 11:38 a.m., motel surveillance footage showed N.S. entering Room 229, leaving the door propped open. The surveillance footage did not show N.S. again.

---

[1] Throughout this opinion, we refer to the victim by her initials.

At 12:41 p.m., surveillance footage showed Smith pushing a box of furniture down the second-floor hallway and walking by Room 229. Smith then stepped into the room through the open door. Smith was in the room for approximately eighteen seconds, then he left to continue moving boxes. Smith closed the door behind him, but the door did not latch or lock.

Smith returned to Room 229 at 12:43 p.m. Surveillance footage showed Smith entering the room, shutting the door behind him, and closing it until it latched.

Smith was in the room with N.S. for approximately nine minutes. Surveillance footage next showed Smith exiting the room at 12:52 p.m., again shutting the door behind him until it latched. As he left the room, Smith was wiping his hands with a towel, which he then discarded. Smith left the motel at 12:57 p.m.

At some point, motel staff noticed that they had not seen N.S. in a while, but her cleaning cart was still outside Room 229. Staff called N.S.'s cell phone, but she did not answer. N.S.'s cell phone, housekeeping list, and master key were later found in another room on the second floor.

At 3:17 p.m., motel staff entered Room 229 and found N.S. unconscious and unresponsive. N.S. was lying with her face and torso on the bed. Witnesses described the position of N.S.'s body as though she was leaning forward to make the bed. The witnesses who found her body claimed it was cold to the touch.

Upon finding N.S., motel staff called 911. First responders arrived and pronounced N.S. dead.

Given the suspicious nature of N.S.'s death, officers began investigating. The officers noticed that her underwear was rolled up, rather than pulled up, making them suspicious that she may have been sexually assaulted. Officers also

viewed the motel surveillance footage, which showed Smith being the last person in the room with N.S. before her death.

On September 9, the medical examiner performed an autopsy on N.S.'s body. The autopsy concluded N.S. died of an accidental fentanyl overdose. After that determination, police concluded that Smith was not involved in or responsible for N.S.'s death, but they were still suspicious there may have been a sexual assault before her death.

Police set out to locate and question Smith. Police put out a media release and received a Crime Stoppers tip about Smith's residence. On September 14, officers executed a search warrant on the residence. The officers found and arrested Smith while executing the warrant. The officers took Smith to the police station where, after receiving *Miranda* warnings, Smith agreed to be interviewed. This interview was recorded.

According to Smith, he met N.S. approximately two months earlier and they hit it off. Smith told police that he and N.S. had consensual sexual intercourse on two prior occasions. Smith admitted that he and N.S. had sex on September 7, but she was "lethargic" and "not really awake," so he ultimately decided to masturbate and touch N.S.'s vagina with his penis.

Smith was asked about the surveillance footage that showed him entering Room 229 twice on September 7. Smith described his interaction with N.S. the first time he went into Room 229 as follows:

> I go in the room and I shake her like hey you okay like what's up and stuff right and um she's just like ah like kinda like disoriented like wobbly maybe whatever you want to call it and stuff and um I'm like hey you okay and stuff like that because I know her from the motel.
>      . . . .

. . . [S]o like I said I like she's kinda disoriented and stuff and she's just sitting there. She just sitting there like this and I'm like you alright and stuff and she like ah (inaudible). So I come out of the room I think I come out of the room at that time.

Smith then described how he went into Room 229 a second time:

[I] go back in the room with her, close the door and stuff and I'm like hey you good blah blah blah like what's up and stuff and now its like, it's almost like she's um what's the word I want to say like she's um not catatonic that's not the.
Q. Lethargic? A. Lethargic means like.
Q. Sleepy. A. Like lethargic yeah okay so that's the word not (inaudible) or like that stuff and I'm like what's up and stuff like that. So I start rubbing on her and stuff like. Like hey what's up or and stuff and then I'm just like you wanna have sex and stuff like that and stuff and she still like lethargic and stuff right and then so then I like pulled her pants down, pulled my pants down and stuff and she's still just kinda like whatever and stuff like that and I'm just like my (inaudible) kinda like jack off kind of. Like, like I be honest like play with her.
Q. Um huh. A. And stuff like that, stuff with my penis sorta like that and like trying with it and I'm just like she's not really awake so I just like jack off and I'm just like, like I'm not doing this (inaudible) like stuff and then um I wipe myself off, leave the room.

Later in the interview, a detective asks Smith again to describe the second time he

went into Room 229 on September 7:

Q. Okay so then you leave and you come back in. Now this part's kinda important and you did a pretty good job but let's, let's paint a picture some more. You go in the room and you said she's kinda lethargic a little sleepy. Um and you are you guys talking kinda tell us what's going on in there. A. Like, like I say I said hey what's up whatever and like that and stuff and it was like ah ugh like ah um.
Q. Is it slow. A. Kinda like ah.
Q. Delayed? A. Almost like a grunt.
Q. Okay. A. Like ah ugh like that's what (inaudible) and stuff so like, like we didn't have like a conversation.
Q. Did it, obviously looking back it probably now you're like whoa at the time what did you think was going on? A. That she was probably fucking working too much just like [Smith's girlfriend] and stuff and probably just tired and then I was just like I wonder if she's drunk like.

Police collected a DNA sample from Smith. A sexual assault kit later revealed the presence of Smith's semen in N.S.'s vagina.

The State charged Smith with sexual abuse in the third degree, second or subsequent offense, in violation of Iowa Code sections 709.4(1)(c), and/or .4(1)(d) and 902.14 (2023). The crime was charged as a second or subsequent offense, subjecting him to a possible enhancement under Iowa Code section 902.14, because of Smith's convictions for other sexual offenses in another state. Smith pleaded not guilty, and the case proceeded to a jury trial in June 2024.

At trial, the State played the surveillance footage of the hallway outside Room 229 for the jury. Sergeant John Focht of the Council Bluffs Police Department testified at trial that, based on his experience, N.S. did not appear to be under the influence of any drugs when seen in the surveillance footage.

The State called Dennis Klein, MD, the state medical examiner. Dr. Klein conducted N.S.'s autopsy and concluded that N.S. died from an accidental fentanyl overdose. During his testimony, Dr. Klein was asked about the effect of fentanyl on the body:

> Q. Okay. So as a person is overdosing on fentanyl, would— would they appear to be lethargic? A. Yes.
> Q. Would—could they be described as not being awake? A. Yes.
> Q. As it continues to progress, could they even be considered to be in a catatonic state? A. That's possible, yes.
> . . . .
> Q. So is it fair to say as, you know, your opinion, again, with your medical expertise, that as fentanyl, as the influence, you know, increases over the body, that a person would become ultimately incapacitated? A. Correct.

Smith did not object to this testimony. Dr. Klein was also asked about photographs taken during the autopsy, including Exhibit 19-A, which was a close-up photograph

of N.S.'s face to show frothing coming from the nose that he associated with fentanyl overdoses. Smith's counsel objected to the admission of Exhibit 19-A based "on 403." The court overruled the objection.

While discussing Exhibit 19-A, Dr. Klein testified as follows:

> Q. Okay, so can you explain to the jury what we are—what we are seeing here? A. Yeah, so this is focusing in on the nose, and you can see right underneath the right nostril this foam-type frothing. And that is foam that builds up from the lungs, goes up the windpipe and goes all the way up into the nose, and then eventually starts to accumulate. And this is—this starts to accumulate after the person is dead and slowly continues to build up that foam. By the time we do the autopsy, that's what we observe.
> Q. Okay. So that might not have been something that was observed as she's on the floor of the hotel, but by the time you got her at autopsy, that's something that you see? A. Yes.

On redirect examination, the State asked Dr. Klein the following hypothetical question:

> Q. If the defendant gave a statement that when he was performing a sex act on [N.S.] that she was lethargic, I'm gonna call it catatonic-adjacent because not quite catatonic, that she wasn't really awake, is that consistent with your medical findings that she would have been in the process of overdosing on fentanyl?
> DEFENSE COUNSEL: Object to improper opinion.
> THE COURT: Overruled.
> THE WITNESS: Yes, that would be consistent.

Council Bluffs Police Department Identification Technician, Laura Rutledge, testified about her work processing the scene in Room 229. While at the motel on September 7, Rutledge took photographs and videos to document the room. During Rutledge's testimony, the State offered Exhibit 8, which was the crime scene video she took of Room 229. Defense counsel objected "under 403." The objection was overruled. Exhibit 8 then played for the jury.

Exhibit 8 is just under four minutes long and starts outside of Room 229, then shows Rutledge opening the door to the room. Once Rutledge opens the door to the room, N.S.'s legs are visible in the video sticking out from between two beds. The video then does a walkthrough of the room, starting with the bathroom, then the bedroom. The video shows that one of the beds is made, and the other was partially made. The video then shows N.S.'s body on the floor, where staff had moved her after finding her unresponsive.

The State also offered Exhibits 9-A through 9-T, which were photographs Rutledge took of Room 229. Defense counsel objected "under 403" to 9-B, 9-G, and 9-I as they depicted N.S.'s body. The court overruled the objection.

At trial, Smith's defense theory was that N.S. consented to the sex act and, therefore, no crime had been committed. As was Smith's right, he did not present any evidence in his defense.

The jury found Smith guilty of sexual abuse in the third degree. Thereafter, Smith waived his right to a jury trial on the Iowa Code section 902.14 enhancement. The court found beyond a reasonable doubt that the enhancement applied based on Smith's prior convictions. The court sentenced Smith to life in prison. Smith now appeals.

## II. Standard of Review.

We review challenges to the sufficiency of the evidence "for the correction of errors at law." *State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024). "We view the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* (cleaned up). "[W]e are highly deferential to the jury's verdict" and

are bound by the verdict when there is substantial evidence to support it. *Id.* (citation omitted).

We review evidentiary rulings for an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (citation omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* at 547 (citation omitted). If there is an abuse of discretion, "we will not reverse unless prejudice is shown." *Id.*

**III. Analysis.**

On appeal, Smith does not dispute that a sex act occurred, nor does he dispute that N.S. was unable to consent. Instead, Smith raises three challenges to his conviction: (1) there is insufficient evidence of his guilt because the State failed to prove that N.S. was alive at the time of the assault; (2) the court erred by introducing a video and photographs depicting N.S.'s deceased body; and (3) the court erred by permitting Dr. Klein to answer the State's hypothetical question about N.S.'s condition at the time of the assault. We will address each issue in turn.

**A. Sufficiency of the Evidence.** Smith's only challenge to the sufficiency of the evidence is that the State failed to prove that N.S. was alive at the time of the assault. Smith argues that the term "person" in Iowa Code section 709.4 should be defined as "a living human being." Based on that, according to Smith, to be guilty of third-degree sexual abuse under Iowa Code section 709.4, the State must prove as an element of the offense that the victim was alive at the time of the

sex act. Smith claims the State failed to prove that N.S. was alive at the time of the sex act, and therefore we should vacate his conviction. The State points out that this argument is made for the first time on appeal and that error is not preserved and, in any event, the elements of the offense as defined by jury instructions did not require this analysis.

"[W]here the record contains substantial evidence, we are bound by the jury's finding of guilt." *State v. Hickman*, 623 N.W.2d 847, 849 (Iowa 2001). "Substantial evidence exists when the evidence would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018) (cleaned up).

The jury was instructed that the State had to prove one of two alternatives:

> (Alternative No. 1)
> 1. On or about the 7th day of September 2023, [Smith] performed a sex act with [N.S.].
> 2. The sex act was performed while [N.S.] was under the influence of Fentanyl, a controlled substance.
> 3. The controlled substance prevented [N.S.] from consenting to the act.
> 4. [Smith] knew or reasonably should have known that [N.S.] was under the influence of the controlled substance.
> OR
> (Alternative No. 2)
> 1. On or about the 7th day of September 2023, [Smith] performed a sex act with [N.S.].
> 2. The sex act was performed while [N.S.] was mentally incapacitated, physically incapacitated, or physically helpless.

Assuming that N.S. being alive at the time of the sex act was inherent to the offense charged and its elements and that error was preserved, we proceed to the sufficiency of the evidence question. To establish Smith committed third-degree sexual abuse, the State had to prove, in part, that N.S. was unable to consent to the sex act either because she was (1) under the influence of fentanyl or

(2) mentally incapacitated, physically incapacitated, or physically helpless. Iowa Code § 709.4(1)(c)–(d). We accept for purposes of this appeal Smith's argument that, under either theory, the State necessarily had to prove that N.S. was alive to prove a lack of consent.[2] Because we assume without deciding the State's burden to show that N.S. was alive at the time of the assault was inherent to its burden of proving a lack of consent, we need not reach Smith's statutory interpretation arguments.

Turning to the sufficiency of the evidence, viewing the record in the light most favorable to the State, we find substantial evidence in the trial record that N.S. was alive at the time of the sex act. The evidence presented at trial established that N.S. did not appear to be under the influence of any drugs before she entered Room 229. By Smith's own admission to police, when he first entered the room, N.S. was "just sitting there" and seemed "disoriented" and "wobbly." Smith described N.S.'s demeanor when he entered Room 229 the second time as "lethargic" and "sleepy." Smith told officers that N.S. "grunted," and he assumed she was tired or possibly drunk. When Smith pulled N.S.'s pants down, Smith again described N.S. as "lethargic." Smith described N.S. during the sex act as "not really awake."

All this evidence is circumstantial proof that N.S. was still alive during the assault, but not in a state to consent. We conclude there was sufficient evidence

---

[2] If N.S. was not alive at the time of the sex act, proof of consent would not be required. *See* Iowa Code § 709.18 ("A person commits sexual abuse of a human corpse if the person knowingly and intentionally engages in a sex act . . . with a human corpse.").

to convince a rational jury that Smith was guilty of third-degree sexual abuse beyond a reasonable doubt.

**B. Admission of Exhibits 8, 9-B, 9-G, 9-I, and 19-A.** Smith next argues the court abused its discretion by admitting Exhibits 8, 9-B, 9-G, 9-I, and 19-A, a video and photographs depicting N.S.'s deceased body, based on Iowa Rule of Evidence 5.403. Exhibit 8 is a video of the crime scene, which includes footage of N.S.'s body on the floor of the motel room. Exhibit 9-B is a photograph of the motel room from just inside the entry and shows N.S.'s fully clothed legs sticking out from between the two beds. Exhibit 9-I is a slightly closer picture of the same area. Exhibit 9-G is a photograph of N.S.'s fully clothed body on the floor of the motel room. Exhibit 19-A is a closeup photograph of N.S.'s face during the autopsy, showing the frothing under her nose about which Dr. Klein testified.

Iowa Rule of Evidence 5.401 provides that "evidence is relevant if . . . [i]t has any tendency to make a fact more or less probable than it would be without the evidence." *See State v. Neiderbach*, 837 N.W.2d 180, 202 (Iowa 2013). "Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Henderson*, 696 N.W.2d 5, 10 (Iowa 2005).

> Unfairly prejudicial evidence is evidence that:
>
> appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case.

*Id.* at 10–11 (citation omitted).

We have "long recognized photographs are not inadmissible simply because they are gruesome or may tend to create sympathy . . . if there is just reason for their admission." *Neiderbach*, 837 N.W.2d at 202 (cleaned up). Trial courts have the discretion to determine whether the probative value of pictures or videos outweighs any potential prejudice. *State v. Hickman*, 337 N.W.2d 512, 515–16 (Iowa 1983).

We conclude the crime scene video and photos—Exhibits 8, 9-B, 9-G, and 9-I—were relevant. Despite Smith's position on appeal, his theory at trial was that N.S. consented to the sex act. The circumstances surrounding the assault, including the fact that N.S. died of an accidental fentanyl overdose sometime thereafter, were relevant to proving whether she was under the influence of a controlled substance or incapacitated and went to the issue of her consent. Further, these exhibits depict the scene where the sex act occurred and document part of the police investigation. For those reasons, these exhibits were relevant under Iowa Rule of Evidence 5.401.

Exhibits 8, 9-B, 9-G, and 9-I were not unfairly prejudicial. Although they showed N.S.'s deceased body, only the video and one photograph showed N.S.'s face. Neither the crime scene video nor photographs are particularly gruesome, nor are they likely to provoke an instinct to punish Smith. In the photos, N.S. is fully clothed and lying on her back. There are no visible wounds or blood. While her face is slightly discolored, she has a neutral expression on her face. The State was clear that Smith was not involved in or responsible for N.S.'s death. We conclude the court properly admitted Exhibits 8, 9-B, 9-G, and 9-I.

We also conclude that Exhibit 19-A was relevant. Evidence of N.S. using a controlled substance was directly relevant to the State's burden of proof. Exhibit 19-A, which showed frothing under N.S.'s nose, supported Dr. Klein's testimony regarding opioid overdoses generally and N.S.'s accidental overdose specifically. Exhibit 19-A was therefore relevant.

The danger of unfair prejudice did not outweigh the probative value of Exhibit 19-A. As our Court has previously noted regarding autopsy photos:

> We have considered the admission of the autopsy photos in the context of the medical examiner's entire testimony and the broader context of the trial, and we do not believe the photos' presentation was inflammatory or directed solely to the passions of jurors. The medical examiner's discussion of the evidence was clinical, and the photos conveyed more than words alone, undercutting any claim the evidence was irrelevant, immaterial, or cumulative.

*State v. Gills*, No. 22-1074, 2024 WL 3518061, at *6 (Iowa Ct. App. July 24, 2024).

Here, although the autopsy photo may have been shocking or disturbing to some jurors, the State did not suggest that Smith had anything to do with N.S.'s drug use, overdose, or death. Instead, the photo helped explain Dr. Klein's testimony regarding the frothing in the respiratory system that occurs after a fatal opioid overdose. His testimony regarding this photograph was clinical, and the State's purpose for admitting the photo was to support its position that N.S. was under the influence of a controlled substance at the time of the assault. This photo was not likely to provoke the jury's instinct to punish Smith because Smith was not being accused of or charged with her death. Smith has failed to show that the court abused its discretion by admitting Exhibit 19-A.

**C. Dr. Klein's Testimony.** Finally, Smith argues the following exchange during Dr. Klein's redirect examination elicited an improper opinion on whether Smith was guilty or innocent:

> Q. If the defendant gave a statement that when he was performing a sex act on [N.S.] that she was lethargic, I'm gonna call it catatonic-adjacent because not quite catatonic, that she wasn't really awake, is that consistent with your medical findings that she would have been in the process of overdosing on fentanyl?
> DEFENSE COUNSEL: Object to improper opinion.
> THE COURT: Overruled.
> THE WITNESS: Yes, that would be consistent.

"Under Iowa Rule of Evidence 5.702, expert opinion testimony is permissible 'if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Slaughter*, 3 N.W.3d at 550. "We generally favor a liberal view on the admissibility of expert testimony." *Id.* at 550–51 (cleaned up). "Admission of expert testimony is thus the general rule, and exclusion or limitation of expert testimony is the limited exception." *State v. Stendrup*, 983 N.W.2d 231, 239 (Iowa 2022).

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Iowa R. Evid. 5.703. "An opinion is not objectionable just because it embraces an ultimate issue." Iowa R. Evid. 5.704. "[A] medical examiner's opinion on cause or manner of death can help the jury determine whether the medical and scientific evidence is consistent with a particular view of the evidence." *State v. Tyler*, 867 N.W.2d 136, 156 (Iowa 2015). "However, an expert may not opine as to whether a particular legal standard has been satisfied or to the defendant's guilt or innocence." *Id.* at 153–54 (cleaned up).

Admitting Dr. Klein's above-referenced testimony was not an abuse of discretion. Dr. Klein did not opine on whether Smith was guilty or whether N.S. was incapacitated or incapable of consenting to a sex act. *See id.* Similarly, Dr. Klein did not impermissibly vouch for the credibility of a witness. *Contra State v. Dudley*, 856 N.W.2d 668, 677–78 (Iowa 2014) (concluding that an expert's testimony that "a child's physical manifestations or symptoms are consistent with sexual abuse trauma . . . allows the expert witness to indirectly vouch that the victim was telling the truth because the expert opines the symptoms are consistent with child abuse.").

Dr. Klein's opinions were based on scientific, technical, and specialized knowledge regarding the effect of fentanyl on the body. The State asked Dr. Klein, based on his knowledge and experience, whether the lethargy Smith described during his interview with police was consistent with an opioid overdose. *See Stendrup*, 983 N.W.2d at 241 ("The district court did not abuse its discretion in allowing [the medical examiner] to offer his opinion through the use of hypothetical questions based on facts supported by the evidence."). This testimony was analogous to Dr. Klein's earlier, unopposed testimony that being "lethargic" or "not really awake" were possible signs of a fentanyl overdose. Smith's counsel was permitted to cross-examine Dr. Klein regarding other possible causes of lethargy, consistent with Smith's theory that N.S. did not ingest the fentanyl until sometime after the sex act. And, the jury was free to consider Dr. Klein's testimony and give it whatever weight the jury thought appropriate. *See State v. Buller*, 517 N.W.2d 711, 713 (Iowa 1994) ("[A]n expert's lack of absolute certainty goes to the

weight of his testimony, not to its admissibility." (citation omitted)). We conclude the court did not abuse its discretion in permitting this testimony from Dr. Klein.

## IV. Conclusion.

Based upon the reasoning above, we affirm Smith's conviction.

**AFFIRMED.**